

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-23-2001

# Page v. Bartels

Precedential or Non-Precedential:

Docket 01-1943

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Page v. Bartels" (2001). *2001 Decisions.* Paper 86.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/86

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed April 23, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-1943

DONALD PAGE; GERTRUDE WATERS; HAROLD
EDWARDS; KATHY EDWARDS; WILLIAM COSTLY; CAROL
G. SCANTLEBURY; JOSE A. CABEZA; VICTOR CABEZA;
ANTONIO J. ALMEIDA; MARIO H. NENO; DAVID V ARGAS;
ELVI VASQUEZ; JOSEPH ARTEAGA; FRED SHAW;
CHARLES ROBINSON; AARON COLLINS; ALLEN
BARNHARDT; THE STATE SENATE REPUBLICAN
MAJORITY; ASSEMBLY REPUBLICAN MAJORITY ,
Appellants

v.

LARRY BARTELS; RICHARD CODEY; SONIA DELGADO;
THOMAS GIBLIN; LEWIS GREENWALD; BONNIE
WATSON-COLEMAN, in their official capacity as Members
of the STATE OF NEW JERSEY APPORTIONMENT
COMMISSION; DEFORST B. SOARIES, JR., Secretary of
the State of New Jersey; JOHN FARMER, Attor ney
General of the State of New Jersey

On Appeal From the United States District Court
For the District of New Jersey
(D.C. Civ. No. 01-cv-01733)
District Judge: Honorable Dickinson R. Debevoise

Argued: April 23, 2001

Before: BECKER, Chief Judge, GAR TH and GREENBERG
Circuit Judges.

(Filed: April 23, 2001)

FREDERICK L. WHITMER, ESQUIRE
 (ARGUED)
Pitney, Hardin, Kipp & Szuch
P.O. Box 1945
Morristown, NJ 07962

Counsel for Appellants

JOHN J. FARMER, JR., ESQUIRE
Attorney General of New Jersey
MARK L. FLEMING, ESQUIRE
Assistant Attorney General
DONNA KELLY, ESQUIRE (ARGUED)
Deputy Attorney General
PAMELA E. GELLERT, ESQUIRE
Deputy Attorney General
MARK TURNER HOLMES, ESQUIRE
Deputy Attorney General
Office of Attorney General of
 New Jersey
Department of Law & Public Safety
Division of Law
Richard J. Hughes Justice Complex
P.O. Box 112
Trenton, NJ 08625

Counsel for Appellees The Attorney
General of New Jersey and the
Secretary of State of New Jersey

2

PAUL L. SMITH, ESQUIRE
  (ARGUED)
Jenner & Block
601 Thirteenth Street, NW
Washington, DC 20005

ROBERT LEVY, ESQUIRE
Scarinci & Hollenbeck, LLC
500 Plaza Drive
P.O. Box 3189
Secaucus, NJ 07096

LEON SOKOL, ESQUIRE
Sokol, Behot & Fiorenzo
433 Hackensack Avenue
Hackensack, NJ 07601

Counsel for Appellees Richard Codey,
Sonia DelGado, Thomas Giblin, Louis
Greenwald, Bonnie Watson-Coleman,
and New Jersey Apportionment
Commission

ROBERT L. CLIFFORD, ESQUIRE
McElroy, Deutsch, & Mulvaney
1300 Mount Kemble Avenue
P.O. Box 2075
Morristown, NJ 07962

Counsel for Appellee Larry Bartels

OPINION OF THE COURT

BECKER, Chief Judge.

This appeal, considered on an extremely expedited basis, arises out of a challenge to New Jersey's recently-adopted state legislative reapportionment plan. On April 11, 2001, the New Jersey Apportionment Commission, char ged under the state constitution with the task of apportioning voters among the legislative districts following each decennial census, adopted a districting plan supported by the Commission's five Democratic members as well as the Commission's neutral "eleventh member." The adoption of

this plan came just before the April 19, 2001 filing deadline for candidates for the upcoming state legislative election. The primary election is (as of the time of this opinion) scheduled to occur on June 5, 2001, with the general election to follow in November.

On April 12, 2001, the day after the Apportionment Commission's adoption of the districting plan, Plaintiffs (Appellants in the current appeal) filed a complaint in the District Court for the District of New Jersey, alleging that the Commission's plan violated S 2 of the V oting Rights Act of 1965 and the Fourteenth and Fifteenth Amendments to the Constitution. We set forth the relevant text in the margin.1 Named in the complaint as Plaintiffs ar e: (1) several African–American registered voters and r esidents of Essex County; (2) several Hispanic registered voters and residents of Essex or Hudson County; and (3) the Republican members of the New Jersey Senate and General Assembly. We have, and will hereinafter, r efer to these individuals collectively as "Plaintiffs." Named as Defendants are: (1) the Apportionment Commission; (2) the Commission's five Democratic members; (3) the Commission's "eleventh member," Professor Larry Bartels; (4) New Jersey's Secretary of State; and (5) New Jersey's Attor ney General. We will hereinafter refer to these parties collectively as "Defendants."

_____

1. Section 2 of the Voting Rights Act of 1965 provides in pertinent part:

> No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote
> on account of race or color. . . .

42 U.S.C. S 1973.

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction equal pr otection of the laws." U.S. Const. amend. XIV, S 1. The Fifteenth Amendment provides that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const. amend. XV, S 1.

4

The gravamen of Plaintiffs' complaint is one of vote dilution. More specifically, Plaintiffs contend that New Jersey's new apportionment scheme deprives African-American voters in Essex County of their ability to have the representatives of their choice elected to the New Jersey legislature. For support, Plaintiffs rely primarily on the fact that, under New Jersey's old apportionment plan, three districts located principally in Essex County had populations that were majority African-American, while under New Jersey's newly-adopted apportionment plan, the African-American population in two of these districts drops below fifty percent, and in the third, stands at 51.2% of the total population. Plaintiffs contend that this elimination and weakening of formerly majority-African-American state legislative districts was a deliberate act on the part of Defendants, intended to dilute (and having the effect of diluting) the vote of the African-American population in the Essex County region of New Jersey.

Upon filing this complaint, Plaintiffs sought and received from the District Court a temporary restraining order preventing Defendants from putting the new apportionment plan into effect. Four days later, on April 16, 2001, the District Court conducted a hearing concerning Plaintiffs' application for further relief, in connection with which both sides presented declarations from experts concerning, inter alia, voting patterns in Essex County, New Jersey. Plaintiffs' submissions, based upon analysis of recent elections, and buttressed by a letter from Martin Luther King III, head of the Southern Christian Leadership Conference, maintained that the reapportionment plan would reverse significant electoral and political gains that African-American voters have secured and threatened to frustrate future opportunities for the vigorous participation of African-American voices in the political marketplace.

Defendants countered that the newly-adopted apportionment plan did not dilute African-American voting strength, but rather enhanced it. According to Defendants, because of the existence of significant racial cross-over voting between African-Americans, whites, and Hispanics in New Jersey generally and in Essex County specifically, an African-American group need not constitute a numerical

5

majority in any single legislative district in or der to possess the effective ability to elect preferr ed representatives. In a submission similarly based upon analysis of r ecent election trends, Defendants contended that the r etention of the three majority-African-American districts advocated by Plaintiffs actually impedes the ability of African-Americans to elect the representatives of their choice, as it "packs" unnecessarily large numbers of African-American voters in the same legislative district, preventing them from exerting electoral influence in other parts of the state.

After hearing these presentations, the District Court issued a bench opinion denying Plaintiffs' application for relief. Plaintiffs timely appealed fr om that denial, and we agreed to hear that appeal on an extremely expedited basis. This appeal largely concerns the events that transpired at the April 16, 2001 hearing, and the precise nature of the District Court's disposition of Plaintiffs' application for relief on that date.

Crucial to our resolution of this appeal is the existence of a special procedural mechanism for constitutional challenges to statewide legislative apportionment schemes. That mechanism, codified at 28 U.S.C. S 2284, requires that a district court of three judges, rather than a single judge, hear "action[s] . . . filed challenging the constitutionality of . . . the apportionment of any statewide legislative body." Although a single district judge has certain limited powers, including the power to issue temporary restraining orders, until the convening of a three-judge court, a single judge does not have the power to entertain applications for preliminary injunctive relief. See 28 U.S.C. S 2284(b)(3). In this case, the District Court did not request the convening of a three-judge court, nor did it determine whether such a request was necessary in light of Plaintiffs' claims. Accordingly, we must decide whether the District Court's disposition of Plaintiffs' r elief application, given the requirements imposed by S 2284, was error.

We conclude that it was, and remand to the District Court so that a three-judge court can be convened to hear the Plaintiffs' Voting Rights Act and constitutional claims. In addition, we decline to grant Plaintiffs' r equest that we provide for interim relief pending action in the lower courts

6

because of our belief that under the present circumstances, we should avoid undue disruption of New Jersey's impending legislative elections. Moreover , as we explain below, we have no jurisdiction to grant interim injunctive relief in this case.

I.

A.

The New Jersey Legislature comprises a State Senate consisting of 40 members and a General Assembly consisting of 80 members. For the purpose of selecting these representatives, New Jersey is divided into 40 legislative districts, with each district selecting one senator and two assembly members. The New Jersey Constitution provides that, following each federal decennial census, "the Senate districts and Assembly districts shall be established, and the senators and members of the General Assembly shall be apportioned among them." N.J. Const. art. IV, S 3, P 1. To discharge this task, the Constitution authorizes the creation of an Apportionment Commission to consist initially of "ten members, five to be appointed by the chairman of the State committee of each of the two political parties whose candidates for governor r eceive the largest number of votes at the most recent guber natorial election." Id. The Constitution further provides that the state committee chairs are to make such appointments on or before November 15 of the year in which the census is taken, and that the Secretary of State is to certify those appointments on or before December 1 of that same year. See id.

Within one month of receipt by the Gover nor of New Jersey of the official decennial census of the United States, or on or before February 1 of the year following the year in which the census was taken, whichever is later , the Commission is required to certify to the Secretary of State the apportionment of voters among the districts. See id. Certification occurs by an affirmative vote of the "majority of the whole number of [the Commission's] members." Id. If the Commission fails to certify an apportionment on or

7

before the constitutionally-fixed deadline, or determines prior to that date that it will be unable to do so, the Constitution mandates that the Chief Justice of the Supreme Court of New Jersey appoint "an eleventh member of the Commission." Id. P 2. W ithin one month after the appointment of this "eleventh member," the Commission, again by a majority vote, is required to certify the apportionment of the legislative districts to the Secretary of State. See id.

B.

The most recent United States decennial census was taken in the year 2000, and, pursuant to its constitutional directive, New Jersey followed the legislative district apportionment procedure delineated above. An Apportionment Commission was appointed and certified in November 2000, consisting of five members each fr om the state Democratic and Republican parties (quite obviously, these were "the two political parties whose candidates for governor receive[d] the lar gest number of votes at the most recent gubernatorial election." Id. P 1). This 10-member Commission was unable to agree on a district apportionment plan, necessitating the appointment of the "eleventh member" by the Chief Justice of the Supreme Court of New Jersey. On March 27, 2001, the Chief Justice selected for that position Larry M. Bartels, a pr ofessor of politics and public affairs at Princeton University, a founding director of the Center for the Study of Democratic Politics at the Woodrow Wilson School of Public and International Affairs, a past pr esident of the Methods Section of the American Political Science Association, and a former chair of the Board of Overseers of the National Election Studies. Professor Bartels has studied and written extensively on electoral politics and statistical models.

Following preliminary discussions both with the Commission's Republican and Democratic delegations to review procedures and standar ds for the Commission's apportionment work, the Commission set about the apportionment task, convening the first meeting on April 2, 2001. During the period between April 2, 2001 and April 11, 2001, the Democratic and Republican contingents

8

submitted several proposed apportionment plans and districting maps to Professor Bartels, which he and his staff received and evaluated. According to Pr ofessor Bartels, each proposed plan was evaluated against a number of specified criteria, including: (1) minimizing population deviations between the districts, in order to secure compliance with the "one person, one vote" rule established under the federal Constitution; (2) ensuring the fair representation of minority voters, as r equired by the Voting Rights Act and the federal Constitution; (3) keeping each of the forty existing districts contiguous; (4) keeping each of the existing districts reasonably compact; (5) respecting municipal boundaries by not splitting towns smaller than Newark and Jersey City among different districts; (6) respecting voting-district boundaries; (7) avoiding any bias in favor of one or the other political party; (8) ensuring that some seats remained competitive; and (9) minimizing voter disruption.

On April 11, 2001, the Commission adopted a modified version of an apportionment plan, labeled "NJ2001," earlier submitted by the Commission's Democratic membership. The final vote was 6-1, with all Democratic members and Professor Bartels, the "eleventh member ," voting in support of the "NJ2001" plan, and with four of thefive Republican members of the Commission abstaining. In adopting the "NJ2001" Plan, the Commission rejected a competing plan, labeled "GOP-H20," submitted by the Republican contingent the previous day, April 10, 2001.

C.

The instant litigation commenced almost simultaneously with the Commission's adoption of the "NJ2001" plan. On April 12, 2001, the day following this adoption, Plaintiffs filed a four-count verified complaint in the District Court. The First and Second Counts alleged violations ofS 2 of the Voting Rights Act, the Third Count claimed an infringement of Plaintiffs' due process and equal pr otection rights under the Fourteenth Amendment, and the Fourth Count asserted a violation of the Fifteenth Amendment. That same day, Plaintiffs requested and received fr om the District Court an Order to Show Cause with Temporary Restraints. The Order

to Show Cause "immediately and temporarily r estrained from employing, ratifying, or in any way putting into effect, directly or indirectly, the apportionment map purportedly approved by the New Jersey Apportionment Commission on April 11, 2001," and further commanded the parties to appear on April 16, 2001 for a hearing befor e the District Court as to "why an Order should not be entered against [the Defendants] restraining and enjoining the [D]efendants . . . from employing, ratifying or in any way putting into effect, directly or indirectly, the apportionment map, purportedly approved by the New Jersey Apportionment Commission on April 11, 2001."

On April 16, 2001, the District Court conducted the hearing and, shortly after the hearing's conclusion, issued an order denying Plaintiffs' application. The events that transpired at this April 16th hearing, and the precise nature of the District Court's disposition of Plaintiffs' application are our central focus, as they go to the significant and dispositive jurisdictional issue raised by this appeal. Accordingly, we will reserve discussion of these matters for Section II below.

Although the District Court denied Plaintiffs' application for relief, it concurrently issued an oral temporary stay, enjoining the printing of ballots for the upcoming election until noon on April 17, 2001. Plaintiffs immediately filed an emergency motion before us, requesting that we continue in effect the District Court's stay of the ballot printing and that we expand the stay to reimpose the general prohibition against the implementation of the newly-adopted reapportionment plan that the District Court had initially granted in its April 12, 2001 Order to Show Cause with Temporary Restraints. On April 17, 2001, Judge Leonard I. Garth heard Plaintiffs' emergency motion and, sitting as a single judge of the Court of Appeals pursuant to Federal Rule of Appellate Procedure 27(c), or dered that the stay entered by the District Court be continued until noon on April 24, 2001.2 That same day, Plaintiffs noticed their

_____

2. Judge Garth declined Plaintiffs' r equest to expand the stay to reimpose the general restraints on implementation that were a part of the District Court's original Order to Show Cause with Temporary Restraints.

10

timely appeal to this Court. In light of New Jersey's impending legislative elections--as noted above, the deadline for candidates to file in the 2001 Senate and Assembly races was set to expire on April 19, 2001, and the primary election is (at the time of this opinion) set for June 5, 2001--we agreed to hear this appeal on an expedited basis. We have jurisdiction over this appeal pursuant to 28 U.S.C. S 1292(a).

II.

The matter of the District Court's jurisdiction, given the specialized procedural requirements imposed by 28 U.S.C. S 2284 for challenges made to state apportionment plans, forms the heart of the instant appeal. The central inquiry before us can be stated as follows: Given the constraints that S 2284 imposes on the actions of a single district judge in proceedings in which a three-judge court is required, did the District Court act outside of its authority when, in its April 16, 2001 order, it denied Plaintif fs' application for an order restraining the implementation of the newly-adopted apportionment plan?3 We further note that our own appellate jurisdiction over the merits of Plaintif fs' claims is a function of the district court's jurisdiction. See Idlewild Bon Voyage Liquor Corp. v. Epstein, 370 U.S. 713, 715-16 (1962) (per curiam) (explaining that a court of appeals may not review the merits of a case that should originally have been determined by a court of three judges, although it may review the district judge's decision not to request such a court).

In general, 28 U.S.C. S 2284 authorizes the convening of
_____

3. We note here that all of the parties have had ample opportunity to brief and argue this jurisdictional issue. Judge Garth first recognized the
existence of a potential 28 U.S.C. S 2284 jurisdictional defect at the time
he heard Plaintiffs' emergency motion for a continuance and expansion of the District Court's stay. As a result, Judge Garth directed the parties
to brief this jurisdictional issue as part of the instant appeal. Moreover,
during the course of a case management confer ence held on April 19, 2001 pursuant to Federal Rule of Appellate Pr ocedure 33, we requested that the parties file further supplemental letter briefing speaking in part
to the S 2284 issue, and the parties complied.

11

a district court composed of three judges, specifies the situations in which such a court is requir ed, and outlines the procedure that such a court is to follow.4 The two provisions most pertinent to this appeal ar e contained in S 2284(a) and S 2284(b)(3). Section 2284(a) identifies those situations in which the convening of a three-judge court is compulsory:

> A district court of three judges shall be convened when . . . an action is filed challenging the constitutionality of . . . the apportionment of any statewide legislative body.

28 U.S.C. S 2284(a) (emphasis added). Section 2284(b)(3) delineates the scope of a single district judge's authority to act (and thus his or her jurisdiction) in pr oceedings that require the establishment of a thr ee-judge district court:

> A single judge may conduct all proceedings except the trial, and enter all orders permitted by the rules of civil procedure except as provided in this subsection. He may grant a temporary restraining order  on a specific finding, based on evidence submitted, that specified irreparable damage will result if the or der is not granted, which order, unless previously revoked by the district judge, shall remain in force only until the hearing and determination by the district court of three judges of an application for a preliminary injunction. A single judge shall not appoint a master, or order a reference, or hear and determine any application for a preliminary or permanent injunction or motion to vacate such an injunction, or enter judgment on the merits. Any action of a single judge may be reviewed by the full court at any time before final judgment.

_____

4. We observe that there has been some doubt expressed as to whether the three-judge court must always be convened for subjects within the scope of S 2284(a), or whether such a court is necessary only when one of the parties has requested it. See, e.g. , 17 Charles Alan Wright, Arthur
R. Miller, & Edward H. Cooper,Federal Practice and ProcedureS 4235 (2d ed. 1988). But see Armour v. Ohio, 925 F.2d 987 (6th Cir. 1991) (en banc) (holding that three-judge courts ar e mandatory for cases encompassed within S 2284(a)). We need not resolve the issue today, for Plaintiffs did request at the April 16, 2001 hearing that such a court be convened.

Id. S 2284(b)(3) (emphasis added). The provisions of S 2284(a) and S 2284(b)(3) are necessarily interdependent: The constraints imposed by S 2284(b)(3) on a single district judge's authority to act are not trigger ed unless the action is one that is required, under the ter ms of S 2284(a), to be heard by a district court of three judges. Grants or denials of injunctive relief by a three-judge court are directly appealed to the United States Supreme Court. See 28 U.S.C. S 1253.

Our analysis of the District Court's actions on April 16, 2001 will thus proceed in two stages. First, we will ascertain the exact nature of the District Court's denial of Plaintiffs' application. If the District Court merely denied an application for a temporary restraining or der, we would clearly lack appellate jurisdiction over that denial.5 See, e.g., Robinson v. Lehman, 771 F.2d 772, 782 (3d Cir. 1985) ("The denial of a temporary restraining or der is not generally appealable unless its denial decides the merits of the case or is equivalent to a dismissal of the claim."). If, however, the District Court's decision constituted a denial of a preliminary injunction, we would have to consider the propriety of such action under S 2284(b)(3), which proscribes a single district judge from"hear[ing] and determin[ing] any application for a pr eliminary . . . injunction" in matters in which the convening of a three-judge district court is required. Should we find that the District Court denied a preliminary injunction, it will then be necessary to proceed to the second stage of our analysis, i.e., whether Plaintiffs' suit repr esented "an action . . . challenging the constitutionality of . . . the apportionment of any statewide legislative body" within the meaning of S 2284(a). We turn now to thefirst stage of our analysis.

_____

5. As explained above, even in actions for which the convening of a three-judge district court is requir ed under 28 U.S.C. S 2284, a single district judge retains the authority to issue a temporary restraining order
upon "a specific finding, based on evidence submitted, that specified irreparable damage will result if the or der is not granted." 28 U.S.C. S 2284(b)(3). This temporary order continues in effect "only until the hearing and determination by the district court of three judges of an application for a preliminary injunction." Id.

A.

At the outset, it should be noted that the District Court's April 16, 2001 order and bench opinion accompanying that order are less than pellucid as to the exact nature of the Court's disposition. The text of the order itself merely recites that "plaintiff 's [sic] application is denied," without specifying whether this action is a denial of a temporary restraining order, or of a pr eliminary injunction. There is record evidence, specifically a portion of the April 16, 2001 hearing before the District Court, which suggests that Plaintiffs' counsel understood that pr oceeding (at least at its outset) to be one concerning the extension of a temporary restraining order, rather than one related to preliminary injunctive relief.6

Nonetheless, after reviewing the full text of the transcript, we are convinced that the District Court's decision constituted a denial of preliminary injunction relief. Most significantly, the District Court, in issuing its bench opinion, explicitly stated that "[t]his, of course, is an application for [a] preliminary injunction," and proceeded to summarize its analysis under each of the four well-known prongs of the test for preliminary injunctive relief. Accordingly, we are convinced that the District Court's April 16, 2001 order amounted to a denial of a pr eliminary injunction. We now proceed to the second, and more involved, stage of our jurisdictional analysis.

B.

As noted above, the bar imposed by 28 U.S.C. S 2284(b)(3) on a single district judge's authority to hear and determine a preliminary injunction application is triggered only in proceedings in which the convening of a three-judge district court is requir ed. Phrased in statutory
_____

6. Plaintiffs' counsel characterized the r elief he was requesting from the
District Court on April 16, 2001 in the following terms: "We believe that, at a minimum, the restraints that you enter ed on the 12th [i.e., April 12th] should be continued to the maximum period permitted under the restraints, to 20 days. . . . I believe you ar e required, your Honor, to have
final relief here to convene a thr ee-judge panel to have a court to try this
case within those 20 days . . . ."

14

terms, the jurisdictional issue at this second stage of our analysis is whether the suit instituted by Plaintif fs in the District of New Jersey constitutes "an action . .. challenging the constitutionality of . . . the apportionment of any statewide legislative body" within the meaning of S 2284(a).

1.

Plaintiffs' verified complaint contests the New Jersey Apportionment Commission's adopted redistricting plan on both constitutional and statutory grounds. Counts One and Two allege vote dilution on the part of Defendants in violation of S 2 of the Voting Rights Act, while Counts Three and Four present Fourteenth and Fifteenth Amendment challenges to the apportionment plan. Moreover , in the April 16, 2001 hearing, Plaintiffs' counsel pr esented both the Voting Rights Act and the constitutional grounds for restraining implementation of the apportionment plan to the District Court. Had Plaintiffs' counsel only brought the Fourteenth and Fifteenth Amendment claims befor e the District Court, and had the Court denied the pr eliminary injunction as to those claims, our jurisdictional answer would be simple and straightforward: Plaintif fs' action was clearly one challenging the constitutionality of New Jersey's statewide apportionment scheme under S 2284(a), and thus the District Court, acting as single district judge, was explicitly proscribed from hearing (let alone denying) the application for preliminary injunctive r elief under S 2284(b)(3).

At the outset of its bench opinion on April 16, 2001, the District Court recognized that Plaintif fs had presented both statutory and constitutional challenges to the New Jersey Apportionment Commission's redistricting plan, observing that Plaintiffs' claims "arise under the Fourteenth and Fifteenth Amendments of the United States Constitution and the Voting Rights Act of 1965." In r endering its decision, however, the District Court stated that the "principal issue" before it was whether the apportionment plan "violates Section 2 of the Voting Rights Act of 1965" and then, taking up the first of the four well-established factors for assessing the propriety of pr eliminary injunctive

15

relief, announced that "there is no likelihood that plaintiffs will ultimately prevail on the merits." W e read the District Court as confining its ruling only to the V oting Rights Act claim, and remaining silent on the constitutional claims.

Thus, from a procedural perspective, we ar e faced with a situation in which the District Court had befor e it both Voting Rights Act and constitutional challenges to a statewide apportionment scheme, and proceeded to the merits of only the statutory claim. Insofar as Plaintiffs did not waive their constitutional challenge during the District Court proceedings,7 we must determine whether the District Court had authority under 28 U.S.C. S 2284 to render such a disposition. For the reasons set forth below, we believe that the District Court acted outside of its authority in entertaining the preliminary injunction application, and thus its decision must be vacated.

Our starting point is the statutory language.8 A straightforward reading of the pertinent language suggests that the entire case, and not just the constitutional claims, must be heard by a three-judge court. This is because the language of S 2284 itself is broadly applicable to "actions"-- not narrowly to "claims"--challenging the constitutionality of the apportionment of a statewide legislative body. Under this view, because the "action" in this case includes a challenge brought under S 2 of the V oting Rights Act, the S 2 challenge, as well as the Fourteenth and Fifteenth Amendment challenges, are subject to S 2284(a)'s

_____

7. To be sure, the bulk of the discussion at the April 16, 2001 hearing related to the Voting Rights Act claim and, as noted, the District Court focused on that claim, but it is clear from the transcript and from the briefs submitted to the District Court that Plaintif fs' counsel was asserting the constitutional claims.

8. Our resort to the case law has not pr oved fruitful. We have been able to locate only one case that squarely addr esses this precise issue: In Armour v. Ohio, 925 F.2d 987 (6th Cir. 1991) (en banc), the Court of Appeals for the Sixth Circuit held that a district judge, sitting alone, had
no jurisdiction to rule on the merits of a S 2 Voting Rights Act challenge to a reapportionment scheme brought in conjunction with constitutional challenges. However, two members of the court wrote separately, concluding that the district court (and hence the appellate court) did have jurisdiction over the merits of the Voting Rights Act claim.

16

requirement that they be heard by a three-judge district court.[9]

However, our analysis cannot be so simple, largely because of the precedent that was generated under older statutory versions of the three-judge court r equirements. Prior to 1976, the Three-Judge Court Act mandated that a three-judge court be convened to hear any action in which plaintiffs sought to enjoin the enforcement of a state statute on constitutional grounds. Because the scope of the Act was potentially quite broad, with resulting disruptions and inefficiencies in the administration of cases, the Supreme Court determined that the Act should be construed to require a three-judge court in as few situations as possible. See, e.g., Swift & Co., Inc. v. Wickham, 382 U.S. 111, 128–29 (1965); Phillips v. United States, 312 U.S. 246, 250–51 (1941). Consequently, decisions from both the Supreme Court and the courts of appeals leaned towar d the view that when a case was presented that included some issues requiring the convening of a three-judge district court and some issues that could be ruled upon by a single district judge, there existed no jurisdictional bar to a single judge disposing of the issues properly within his or her province. See, e.g., Rosado v. Wyman, 397 U.S. 397, 403 (1970). Further, some courts appeared to suggest that even where a single district judge improperly consider ed issues that should have been referred to a thr ee-judge court, the courts of appeals would have jurisdiction to consider appeals based solely on the aspects of the judge's ruling that could have been legitimately decided by a single judge. See, e.g., Stone v. Philbrook, 528 F.2d 1084 (2d Cir. 1975).

These rules reached their zenith with the Supr eme Court's decision in Hagans v. Lavine, 415 U.S. 528 (1974). In that case, the plaintiffs challenged a state statute both on the ground that it conflicted with federal law, and on

_____

9. It is beyond dispute that a three-judge court, once convened, would have jurisdiction over the Voting Rights Act claim. See, e.g., United States v. Georgia Pub. Serv. Comm'n, 371 U.S. 285, 287–88 (1963). Rather, the question we face is whether the single judge, sitting alone, had jurisdiction over this claim, given the constitutional claims that were also present.

17

constitutional grounds. Under the old three-judge court requirements, the constitutional claims could only be heard by a three-judge court, but there was no such requirement for the statutory challenge. Thus, in the lower court proceedings in Hagans, a single district judge, without requesting a three-judge court, considered the statutory issues alone and held in the plaintiffs' favor. Then, because the case had been resolved on statutory grounds, the judge determined that the convening of a three-judge court to entertain the constitutional challenge was not required.

The case made its way to the Supreme Court, which upheld the district judge's choice to adjudicate the statutory claims before determining whether the convening of a three-judge court was necessary. The Court rested its holding on several policy considerations, chiefly concerns for judicial efficiency, and the fact that, had the three-judge court been convened at the outset, the statutory issues might still have been remanded for the single judge's resolution. See id. at 544–45. Thus, a straightforward application of Hagans might well lead us to conclude that the District Court had authority to act upon (and thus that we have appellate jurisdiction over the merits of) Plaintiffs' Voting Rights Act claim. We believe, however, that Hagans is not apposite to the precise situation before us.

In 1976, Congress amended the Three-Judge Court Act in response to complaints that the system was cumbersome, labyrinthine, and unnecessary. The new statute, as described at the outset of this Section, only requires a three-judge district court for certain constitutionally-based apportionment challenges, and when another Act of Congress specifically requires one. See 28 U.S.C. S 2284(a). Thus, the 1976 amendments limited the scope of the Three-Judge Court Act considerably, making it questionable whether the policy considerations that drove the original, narrow construction are still applicable today. These revisions militate in favor of our broader reading of S 2284(a)'s scope.

One could respond to this analysis by arguing that Congress deliberately intended to exclude statutory-based apportionment challenges brought under S 2 of the Voting Rights Act from the three-judge court requirement imposed

18

by 28 U.S.C. S 2284(a). In support of this ar gument, one could point to 42 U.S.C. S 1973c, which necessitates the convening of a three-judge court to hear claims brought under the preclearance requirements of S 5 of the Voting Rights Act. This might suggest that Congress made a deliberate choice to require a thr ee-judge court for only particular types of Voting Rights Act cases, exempting claims brought under S 2. If such wer e the case, then there would be no reason not simply to follow Hagans and allow a single judge to resolve the statutory questions first.

However, although this argument is plausible, we believe it must ultimately fail. We do not believe that Congress made a deliberate choice to distinguish between constitutional apportionment challenges and apportionment challenges brought under S 2 of the V oting Rights Act. This is because, when the three-judge court statutes were revised in 1976 to require that this specialized tribunal hear challenges to the "constitutionality of . . . the apportionment of any statewide legislative body," S 2 of the Voting Rights Act was not available to litigants seeking to challenge apportionment. At that time, apportionment challenges were generally constitutional in nature. See Holder v. Hall, 512 U.S. 874, 893-94 n.1 (1994) (Thomas, J., concurring in the judgment) (explaining the history of apportionment and vote dilution claims). Section 2 of the Voting Rights Act did not become widely used for apportionment challenges until the 1982 amendments to that provision, and the Supreme Court's subsequent decision in Thornburg v. Gingles, 478 U.S. 30 (1986). In fact, as late as 1980, the Supreme Court had not even definitively determined whether S 2 of the Voting Rights Act created a private right of action for voters. See City of Mobile v. Bolden, 446 U.S. 55, 60 (1980). When Congress, in 1976, revised 28 U.S.C. S 2284 to limit the three-judge court requirement to those actions in which "the constitutionality of . . . the apportionment of any statewide legislative body" was challenged, the established statutory basis for such apportionment challenges was S 5 of the Voting Rights Act, see Allen v. State Bd. Of Elections, 393 U.S. 544, 569 (1969), whose own statutory pr ovisions required the convening of a three-judge court, see 42 U.S.C. S 1973c.

Further, the legislative history of the 1976 revisions to 28 U.S.C. S 2284 clearly demonstrates that Congr ess was concerned less with the source of the law on which an apportionment challenge was based than on the unique importance of apportionment cases generally. The Senate Report, for example, consistently states that "three-judge courts would be retained . . . in any case involving congressional reapportionment or the r eapportionment of any statewide legislative body," S. Rep. No. 94-204 (1976), reprinted in 1976 U.S.C.C.A.N. 1988, 1988, and goes on to explain that "[t]he bill preserves thr ee-judge courts for cases involving . . . the reapportionment of a statewide legislative body because it is the judgment of the committee that these issues are of such importance that they ought to be heard by a three-judge court," id. at 1996; see also Allen, 393 U.S. at 582-83 n.1 (Harlan, J., concurring in part and dissenting in part) (concluding that, unlike in other cases involving the three-judge court r equirement, the three-judge requirement of S 5 of the Voting Rights Act should not be interpreted narrowly, because "generally a plaintiff attacking a state statute [underS 5] could also make at least a substantial constitutional claim").

Based upon this history, we conclude that because statutory Voting Rights Act challenges to statewide legislative apportionment are generally inextricably intertwined with constitutional challenges to such apportionment, those claims should be consider ed a single "action" within the meaning of S 2284(a). Thus, when a single district judge is presented with both types of claims, he or she may not resolve the Voting Rights Act issues in isolation while reserving the constitutional claims to a three-judge district court; rather, the single district judge should adhere to the limitations on his authority imposed by S 2284(b)(3).

Finally, we note that practical and policy considerations support our construction of S 2284. Questions regarding the legitimacy of the state legislative apportionment (and particularly its review by the federal courts) are highly sensitive matters, and are regularly r ecognized as appropriate for resolution by a thr ee-judge district court. See, e.g., Chapman v. Meier, 420 U.S. 1, 14 (1975)

(referring to apportionment challenges as "r egular grist for the three-judge court"). As the Supr eme Court has explained, in such redistricting challenges, the potential for federal disruption of a state's internal political structure is great, counseling in favor of the establishment of a specialized adjudicatory machinery: "Congr ess has determined that three-judge courts ar e desirable in a number of circumstances involving confr ontations between state and federal power or in circumstances involving a potential for substantial interference with government administration." Allen, 393 U.S. at 563. Thus, challenges to apportionment are the kinds of claims r equiring what has been described as the "special and extraor dinary procedure" represented by the convening of a three-judge district court. Kennedy v. Mendoza-Martinez, 372 U.S. 144, 155 (1963).

More significantly, it is clear that questions regarding the legitimacy of an apportionment scheme, whether under the Constitution or under the Voting Rights Act of 1965, are "intimately related," Armour v. Ohio, 925 F.2d 987, 988 (6th Cir. 1991) (en banc), and are intensely fact-bound, depending "entirely on the facts and cir cumstances of each case." Voinovich v. Quilter, 507 U.S. 146, 155 (1993). These observations inveigh against permitting a single district judge to reach the merits only as to statutory Voting Rights Act claims. Under a scheme in which a single district judge can legitimately adjudicate the merits of a V oting Rights Act challenge (while leaving resolution of the Fourteenth and Fifteenth Amendment claims to a three-judge court), two tribunals would be considering closely similar , albeit not perfectly identical, challenges to the same state government action. Not only does this cleavage seem unnecessarily redundant, but it creates the danger that the single district judge's conclusions with regard to the statutory claims-- particularly his or her factual findings--might well have the effect of dictating the outcome of the constitutional claims, thereby thwarting the expressed congr essional policy of requiring a specialized three-judge court for the disposition of such singularly important matters.10

_____

10. We recognize that the Supr eme Court in Hagans was obviously not concerned that a single district judge's factual conclusions in resolving

For these reasons, we conclude that when plaintiffs mount challenges to statewide legislative apportionment schemes on both Voting Rights Act and constitutional grounds, both sets of claims must be hear d by a three-judge district court. A single district judge may act on these claims only to the extent permitted by the pr ocedure set forth in S 2284(b)(3).

2.

Our analysis cannot end here, however, as we still must consider the argument that the District Court effectively complied with the procedure set forth inS 2284(b)(3) in its April 16, 2001 disposition of Plaintiffs' pr eliminary injunction request. More specifically, our holding leaves open the possibility that a single district judge before whom both Voting Rights Act and constitutional challenges to a statewide apportionment scheme are raised could decline to convene a three-judge court and could r each the merits of the statutory claims if he or she were to conclude that the plaintiffs' constitutional challenge was legally frivolous and insubstantial. The authority for this proposition comes from the Supreme Court's decision in Goosby v. Osser, 409 U.S. 512 (1973), in which the Court stated that the convening of a three-judge district court is not requir ed when the plaintiffs' "constitutional attack" on state government action is "insubstantial." Id. at 518; see also Bailey v. Patterson, 369 U.S. 31, 33 (1962) (per curiam) (concluding, under the older version of the Three-Judge Court Act, that a three-judge district court is requir ed "only when an injunction is sought `upon the ground of the unconstitutionality' " of a state gover nment act, and that

_____

a statutory claim might dictate the decision of the three-judge court on the constitutional claim; to the contrary, the Court recognized that the three-judge court, in considering the constitutional claim, might well prefer a single judge to make detailed factualfindings. See Hagans, 415 U.S. at 544. Nor was the Hagans Court concer ned with the relationship, intimate or otherwise, between the statutory and constitutional claims. However, as explained above, we believe that the 1976 revisions evince Congress's particular sensitivity to apportionment challenges and lessen the need for a narrow construction of thr ee-judge court requirements, rendering Hagans inapplicable.

22

"[t]here is no such ground when the constitutional issue presented is essentially fictitious"). Thus, deeming the District Court's decision on April 16, 2001 to be in compliance with the procedure set forth in 28 U.S.C. S 2284(b) would require us to characterize the District Court's decision in the following terms: W e would have to conclude that, in its April 16, 2001 order and bench opinion, the District Court found Plaintiffs' constitutional claims to be frivolous, and then proceeded to consider the merits of only their Voting Rights Act claim. We cannot reach such a conclusion, for two reasons.

First, having read the transcript of the District Court's proceedings on April 16, 2001, we believe that the Court never reached the requisite conclusion as to Plaintiffs' Fourteenth and Fifteenth Amendment claims. Quite clearly, the Court never explicitly held that the claims wer e frivolous or insubstantial. Moreover, to the extent that a single district judge can reach an implicit conclusion that a claim is frivolous, we do not believe that the District Court reached such a conclusion in this case. Even were we to interpret the Court's statement in its bench opinion that "there is no likelihood that plaintif fs will ultimately prevail on the merits" as a comment on the constitutional, as well as the statutory, claims, it cannot properly be characterized as a ruling that Plaintiffs' constitutional claims are insubstantial, as it is well-established that a district court's conclusion that a party will lose (or is likely to lose) on the merits of a claim is not equivalent to a conclusion of frivolousness for the purposes of establishing jurisdiction. See Bell v. Hood, 327 U.S. 678, 682-83 (1946).

Second, we believe that Plaintiffs' Fourteenth and Fifteenth Amendment challenges are not constitutionally frivolous or insubstantial, as assessed under the standard announced in such Supreme Court cases as Goosby and Bailey. Goosby and Bailey set an extremely high bar for frivolousness: To be deemed frivolous, a constitutional claim must be "essentially fictitious,""wholly insubstantial," and "legally speaking non-existent," Bailey, 369 U.S. at 33. The Goosby decision elaborated on this rigorous standard:

23

> In the context of the effect of prior decisions upon the substantiality of constitutional claims, . . . claims are constitutionally insubstantial only if the prior decisions inescapably render the claims frivolous; pr evious decisions that merely render claims of doubtful or questionable merit do not render them insubstantial . . . . A claim is insubstantial only if its unsoundness so clearly results from the previous decisions of this court [i.e., the Supreme Court] as to for eclose the subject and leave no room for the infer ence that the questions sought to be raised can be the subject of controversy.

409 U.S. at 518 (internal citations and quotations omitted). Plaintiffs' constitutional claims, on their face, cannot be deemed constitutionally frivolous or insubstantial. 11 Indeed, Defendants did not press this point at oral ar gument.

An apportionment scheme will be subject to strict scrutiny under the Fourteenth Amendment's Equal Protection Clause if race is the "pr edominant factor" in the drawing of district lines. Bush v. Vera , 517 U.S. 952, 959 (1996) (plurality opinion); see also Shaw v. Reno, 509 U.S. 630, 649 (1993) (explaining that legislative districting schemes can violate the Fourteenth Amendment's Equal Protection Clause if they "cannot be understood as anything other than an effort to separate voters . . . on the basis of race"). Such a redistricting scheme may also violate the Fifteenth Amendment, at least if done with the purpose of depriving a racial minority group of the right to vote. See, e.g., City of Mobile v. Bolden, 446 U.S. 55, 62–63 (1980) (plurality opinion); Gomillion v. Lightfoot, 364 U.S. 339, 346 (1960) (holding that "when a legislature singles out a

_____

11. An argument might be advanced that this Court ought not to be making an insubstantiality determination, on the theory that only the District Judge may rule upon this matter in thefirst instance, subject to appellate review. See, e.g., Fort v. Daley, 431 F.2d 1128, 1131 (7th Cir. 1970). We disagree. Given the exigencies under which this type of litigation is perforce conducted, and the extensive scope of the submissions and arguments before us, it would seem fatuous for us not to reach this issue, which is an essential ingr edient informing the District Court's decision as to whether to r equest a three-judge court –– a decision which is itself subject to our plenary r eview.

24

readily isolated segment of a racial minority for special discriminatory treatment," such as by r econfiguring city boundaries so as to deprive African–American r esidents of the right to vote in municipal elections, such action "violates the Fifteenth Amendment.").12

Plaintiffs have alleged both Fourteenth and Fifteenth Amendment violations in Counts Three and Four of the verified complaint they filed before the District Court. The legal theories and factual support underlying these constitutional claims are not yet fully developed, but this is understandable given the fact that Plaintiffs brought their complaint only one day after the Apportionment Commission adopted and certified the latest districting plan for the state of New Jersey. As Goosby and Bailey teach, our inquiry here is not whether Plaintif fs have a probability (or even a possibility) of prevailing on their constitutional arguments, but whether such claims are inherently implausible on their face, e.g., because they ar e clearly foreclosed by existing precedent. Examining Plaintiffs' constitutional claims, underdeveloped as they may be, we cannot say that they are legally implausible.

Throughout the admittedly brief period of this litigation, Plaintiffs have pleaded in their papers and continue to contend that Defendants acted with a discriminatory purpose––particularly a discriminatory purpose tar geted at African–American voters in Essex County––in that Defendants sought to dilute the effective str ength of the African–American vote in that region. Plaintif fs principally

_____

12. We are aware that the Supr eme Court has not expressly concluded that a claim of vote dilution is cognizable under the Fifteenth Amendment, see, e.g., Reno v. Bossier Parish Sch. Bd., 528 U.S. 320, 334 n.3 (2000) ("[W]e have never held that vote dilution violates the Fifteenth Amendment."), and has never explicitly found a legislative redistricting plan to run afoul of the Fifteenth Amendment, see Voinovich v. Quilter, 507 U.S. 146, 159 (1993) ("[W]e never have held any legislative apportionment inconsistent with the Fifteenth Amendment."). Nonetheless, Bossier Parish and V oinovich do not alter our frivolousness analysis in regard to Plaintiffs' Fifteenth Amendment claim. We simply cannot conclude that the Court's silence and r eservation of these issues clearly forecloses Plaintiffs' Fifteenth Amendment claim, so as to render it frivolous or insubstantial under Goosby's strict standard.

25

allege that this discriminatory and dilutive intent is obvious from the fact that, under the newly-adopted plan supported by Defendants, the percentage of the African-American population in two of the three existing majority-African-American legislative districts in Essex County (Districts 27 and 29) would be reduced to below fifty per cent, while in the third (District 28), the African-American majority would be preserved by a mere 1.2%.

Plaintiffs amplify their argument by contending that these three majority-African-American districts were created as part of the post-1990-decennial-census reapportionment with the goal of safeguar ding the strength of the African-American vote in Essex County, and that, in the intervening decade, no changes in conditions or circumstances occurred that justify the elimination of such districts. According to Plaintiffs, the inference that must therefore be drawn is that Defendants purposefully sought to reduce and dilute the strength of the African-American vote in the Essex County region. Further , Plaintiffs assert that, in at least one of these three districts (District 27), the reduction in African-American population was done with the deliberate intent of safeguarding the incumbent senator's seat by transforming his constituency from a majority-African-American to a majority-white one.

If Plaintiffs' claims are factually corr ect, then such purposeful action on the part of Defendants may ar guably amount to a violation of either the Fourteenth or Fifteenth Amendments. As noted above, at this nascent stage of the litigation, the evidence supporting Plaintif fs' contentions as to the Defendants' motivation in favoring the newly-adopted apportionment plan is scant at best. But Goosby 's frivolousness standard is not a test of the sufficiency of Plaintiffs' evidence; rather, it is an inquiry into whether, on their face, Plaintiffs' constitutional claims are "essentially fictitious," "wholly insubstantial," and"legally speaking non-existent." We cannot say that they ar e.13

_____

13. We emphasize, of course, that by r endering this opinion we intimate no view as to whether Plaintiffs' claims should ultimately prevail.

26

3.

Thus, we conclude that the District Court committed error by failing to follow the procedur e specified in 28 U.S.C. S 2284(b). When presented with an action involving both statutory Voting Rights Act and constitutional challenges to the apportionment of a statewide legislative body, a single district judge cannot reach the merits of the statutory claims unless he or she concludes that the constitutional claims are legally frivolous and insubstantial. The District Court made no such ruling in this case, and our own review leads us to conclude that Plaintiffs' Fourteenth and Fifteenth Amendment claims ar e not legally frivolous. Accordingly, we will vacate the District Court's April 16, 2001 order, with instructions to the District Court to initiate the procedure for convening a three-judge court to hear both the Voting Rights Act and the constitutional challenges brought by the Plaintiffs.

III.

Having reached (and explained) our conclusion as to the District Court's error, we are obliged to address one additional matter, i.e., the issue of further interim relief. On April 16, 2001, Plaintiffs requested and received orally from the District Court a temporary stay enjoining Defendants from printing ballots for the upcoming legislative elections. This stay was set to expire at noon on the following day, April 17, 2001. On April 17, 2001, Plaintiff r equested and received from our Court (acting thr ough Judge Garth, sitting as a single judge) an extension of the District Court's stay; this extended stay is scheduled to expir e at noon on April 24, 2001. Judge Garth declined Plaintif fs' request for an expansion of the stay that would generally enjoin Defendants from implementing the Apportionment Commission's redistricting plan. On this appeal, Plaintiffs ask that we grant them further and broader interim relief, in order to prevent (in some fashion) the implementation of the newly-adopted redistricting plan. W e decline to do so.

First, we are unsure as to the exact natur e and scope of the relief that Plaintiffs request. In the conclusion of their Brief to this Court, Plaintiffs ask us to"impose interim

27

injunctive relief against defendants to enjoin and restrain implementation or reliance" on the newly-adopted legislative redistricting plan. To the extent that Plaintiffs are asking us to grant preliminary injunctive r elief, we are powerless to oblige. It is beyond cavil that the thr ee-judge district court, and not this Court, is the pr oper forum for seeking such an interim injunction. Neither ar e we faced with a request for an injunction pending appeal. With this opinion and the accompanying judgment, the (pr esent) appeal is over.14 Mor eover, given the nascent stage of these proceedings, and the heavy factual development that will likely need to occur prior to a final disposition of this matter, it would not, at all events, seem appropriate either to extend or expand the current stay, which Judge Garth had entered with the understanding that it would be temporary in nature. For all these reasons, we will simply allow that stay to expire at its scheduled time, at noon on April 24, 2001.

In reaching these conclusions, we also note our own keen awareness of the significant disruption that action on our part (or on the part of any federal court issuing interim relief) will have on the upcoming New Jersey legislative elections. The original deadline for filing a State Senate or General Assembly candidacy, April 19, 2001, has alr eady passed. We are also fast approaching the date of this summer's upcoming legislative primary, scheduled (as of the time of this opinion) to occur on June 5, 2001, in conjunction with the gubernatorial primary and the primaries for certain local races.15 Any interim injunctive or

_____

14. Further, we are aware that the issuance of a "temporary stay" for an indefinite period may well be the functional equivalent of a (forbidden) preliminary injunction. See Stratton v. St. Louis Southwestern Ry. Co., 282 U.S. 10, 17 (1930) (explaining that the exclusive powers of a three-judge court are ones of "substance and not .. . form," and that "[i]t matters not whether the injunction is called pr eliminary or interlocutory,
or is styled a temporary restraining or der").

15. We have been informed by counsel that the New Jersey Legislature is considering a bill, introduced on April 20, 2001, that would postpone the date of the primary election by three weeks, to June 26, 2001, and make an identically lengthy postponement to the candidacy filing deadline, moving it to May 10, 2001. We ar e not aware of the current status of this bill.

28

restraining action on our part, particularly action that broadly proscribes the implementation of the redistricting plan adopted by the Apportionment Commission, would likely delay or suspend the legislative elections. Further, if the legislative elections were delayed in this fashion, the State of New Jersey, if it desired to also avoid postponing the concurrent gubernatorial and local elections, would be required to hold two separate primaries and general elections for its state offices, at great expense to the taxpayers. Defendants have forcefully spun out the implications of such disruption in their briefs. 16 Federal court intervention that would create such a disruption in the state electoral process is not to be taken lightly. This important equitable consideration, going to the heart of our notions of federalism, was expressed quite cogently by the Supreme Court in Reynolds v. Sims, 377 U.S. 533 (1964):

> [U]nder certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid. In awar ding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles.

Id. at 585 (emphasis added). This war ning in Sims on the issue of relief was delivered after  the Supreme Court found,

_____

16. They stress the need for at least seven weeks between the filing deadline and the election to allow for preparation of ballots, and delivery
of absentee and military ballots overseas. They further argue that delaying the primary election would, in turn, create other problems, including truncating the general election campaign, depriving candidates of sufficient time to gather support for their candidacies, and depriving voters of time to develop informed choices. Finally, they stress that, even
assuming final adjudication on the merits in Plaintiffs' favor, there would
be further delays while New Jersey was given its fair opportunity to correct apportionment errors befor e the imposition of a court-ordered remedial plan.

29

on the merits, that a state legislative apportionment plan violated the Constitution. If aggressive federal court intervention is not necessarily appropriate following an adjudication of unconstitutionality, then sur ely it cannot be any more appropriate at this early stage of the proceedings. See Chisom v. Roemer, 853 F.2d 1186, 1189 (5th Cir. 1988) (vacating a district court's preliminary injunction of a state election, on the rationale that "intervention by the federal courts in state elections has always been a serious business, not to be lightly engaged in" (inter nal quotations and citations omitted)).

Moreover, in undertaking the equitable calculus suggested by Sims, we certainly must account for the scant factual record brought before the District Court and before us. For instance, Plaintiffs' principal legal challenge to New Jersey's apportionment plan thus far has been a vote dilution claim brought under S 2 of the V oting Rights Act. It is well-established that, to make out a claim that a legislative districting scheme has diluted a minority group's vote in contravention of S 2, a plaintif f must demonstrate, as a threshold matter, the existence of three factors first articulated in Thornburg v. Gingles , 478 U.S. 30 (1986): (1) that the minority group "is sufficiently large and geographically compact to constitute a majority in a single member district"; (2) that the minority gr oup is "politically cohesive," i.e., that it votes as a racial bloc; and (3) "that the white majority votes sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate." Id. at 50–51; see also Jenkins v. Red Clay Consol. Sch. Dist., 4 F.3d 1103, 1115 (3d Cir. 1993). It is also clear that a plaintiff 's showing of these three factors is necessarily fact-intensive, requiring a careful and searching examination of the specific circumstances of each case. See, e.g., Voinovich v. Quilter, 507 U.S. 146, 154–55 (1993); Gr owe v. Emison, 507 U.S. 25, 41 (1993); Gingles, 478 U.S. at 46 ("[T]he [S2] results test does not assume the existence of racial bloc voting; plaintiffs must prove it.").

But it is not just Plaintiffs whose claims r equire factual development. Thus far, Defendants have principally argued that, although the newly-adopted apportionment scheme may reduce the African-American percentage in previously

30

majority-minority districts to below fifty per cent, that reduction does not dilute the African-American group's voting power in violation of S 2 of the V oting Rights Act because, at least in Essex County, there is significant cross-over voting between white, African-American, and Hispanic groups. We note here that the Supreme Court has expressly reserved a final decision as to several of the issues raised by Defendants' argument her e--i.e., (1) whether an "influence district" in which a minority group comprises less than half the population can nonetheless comport with S 2 requirements, given the existence of cross-over voting by the majority group, see, e.g., Voinovich, 507 U.S. at 154 (recognizing the possibility of influence districts in which minority group members "could elect their candidate of choice . . . if they are numer ous enough and their candidate attracts sufficient cross-over votes from white voters" but noting that "[w]e have not yet decided whether influence-dilution claims such as appellees' are viable under S2" and resolving not  to "decide that question today"); and (2) whether the presence of two minority groups, e.g., African-Americans and Hispanics, can be aggregated for purposes of determining voting strength and effectiveness, if cross-over voting between the two groups can be demonstrated, see, e.g., Growe, 507 U.S. at 41 (assuming, without deciding, "that it was per missible for the District Court to combine distinct ethnic and language minority groups for purposes of assessing compliance with S 2").

Whichever way these issues are ultimately r esolved as a legal matter, one thing is certain: Evidence establishing the factual existence of such voting behavior will be absolutely vital. See, e.g., id. ("[W]hen dilution of the power of . . . an agglomerated [i.e., multi-minority group] political bloc is the basis for an alleged violation, proof of minority political cohesion is all the more essential."). Such proof in apportionment challenges usually comes in the for m of expert testimony and empirical evidence analyzing the voting behavior of the majority and minority gr oups in the region at issue. We do not have such a r ecord before us. Both Plaintiffs and Defendants rely primarily on statements made by witnesses in certifications whose accuracy and credibility has not been tested through cr oss-examination.

31

Given the fact-sensitive nature of a challenge to a statewide legislative apportionment scheme, we believe that the most appropriate procedural course is a r emand to the District Court for a convening of a three-judge court that will oversee the factual development necessary for full and appropriate resolution of Plaintif fs' challenges. Moreover, given the paucity of the facts before us, we certainly believe that any further intervention on our part, in the form of interim relief, would be inappropriate at this juncture.

In denying interim relief, we certainly ar e not foreclosing the Legislature by statute from postponing the time of the primary in order to permit the thr ee-judge court to be constituted and for it to consider an application by Plaintiffs for a preliminary injunction after development of an adequate record. In this regar d, we point out that if the Legislature postpones the primary, an action which already has been proposed, it might be possible to r econcile the obviously desirable end of having the legal issues Plaintiffs raise decided prior to the primary election with the important consideration that the state election pr ocess not be disrupted unduly. Of course, at least at this time, any decision to postpone elections should be made in the legislative rather than judicial arena.

And in stating that we are declining at this stage to issue any further relief, we are not for eclosing (in fact, we could not foreclose) the possibility of the parties seeking some form of interim relief in the proceedings on remand below, assuming, of course, that the procedures set forth in S 2284(b) are followed. That is, Plaintif fs could, consistently with S 2284(b)(3), seek another temporary r estraining order from the District Court, and the District Court could grant that temporary order upon "a specificfinding, based on evidence submitted, that specified irreparable damages will result if the order is not granted." 28 U.S.C. S 2284(b)(3). Moreover, as noted above, once the thr ee-judge district court is convened, Plaintiffs could apply to that court for preliminary injunctive relief.

IV.

Given the potentially disruptive effects that our actions could have on New Jersey's electoral process, it is

incumbent upon us to articulate our disposition of this appeal with surgical accuracy. Our exact disposition is as follows: We will vacate the District Court's April 16, 2001 order, and remand the case to the District Court, so that a district court of three judges, as specified in 28 U.S.C. S 2284, can be convened to hear both the V oting Rights Act and the constitutional challenges brought by Plaintiffs. With respect to interim relief, the temporary stay issued on April 17, 2001 will expire at its scheduled time, April 24, 2001 at noon. We will grant no further interim relief in this matter. We note, however, that neither the District Court, acting as a single judge, nor the district court of three judges that will be convened, is foreclosed fr om acting (and issuing interim relief), provided that they comply with the limitations on their authority imposed by 28 U.S.C.S 2284.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit