ARIZONA MINORITY COALITION FOR FAIR REDISTRICTING, et al. Plaintiffs,

v.

ARIZONA INDEPENDENT REDISTRICTING COMMISSION, et al. Defendants.

No. CIV.–040797–PHX–ROS.

United States District Court, D. Arizona.

April 7, 2005.

---

Lisa Tewksbury Hauser, Esq., Cameron Charles Artigue, Esq., Leonard W. Aragon, Gammage & Burnham PLC, Jose De Jesus Rivera, Esq., Haralson Miller Pitt Feldman & McAnally PLC, Mary Ruth O'Grady, Jessica Gifford Funkhouser, Esq., Office of the Attorney General, Phoenix, AZ, for Defendants.

Mark C. Dangerfield, Esq., Gallagher & Kennedy PA, David J. Cantelme, Esq., David Aaron Brown, Jennings Strouss & Salmon Plc Collier Ctr, Phoenix, AZ, Deborah Louise Herbert, Esq., Jeffrey David Dollins, Mohave County Attorneys Office, Kingman, AZ, Ronald C. Ramsey, Esq., John Donald Hickman, Bullhead City, AZ, Holly Jeanne Hawn, Martha Starr Chase, Santa Cruz County Attorney, Nogales, AZ, Ronald Marc Lehman, Esq., Gabroy Rollman & Bosse PC, Tucson, AZ, for Intervenors.

## AMENDED ORDER

SILVER, District Judge.

This Amended Order corrects typographical errors in the Court's previous Order entered on March 1, 2005. On May 26, 2004, the Court issued an Order ruling on various pending motions in this action and promising that a written opinion would follow. This is that opinion. Pending before the Court were Plaintiffs' Request to Convene a Three–Judge Court, Application for Order to Show Cause, and Application for a Preliminary Injunction. Also pending was Defendant Arizona Independent Redistricting Commission's Motion to Dismiss. Because this dispute centered around state constitutional issues and because Plaintiffs' federal claims had no merit, the Court granted the Motion to Dismiss and denied the remaining Motions.[1]

Paul F. Eckstein, Esq., Suzanne Renee Scheiner, Michael S. Mandell, Brown & Bain PA, Richard A. Halloran, Esq., David Daniel Weinzweig, Lewis & Roca LLP, Aaron Kizer, Esq., Law Office of Aaron Kizer PLC, Phoenix, AZ, Dana Lee Bobroff, Navajo Nation Department of Justice, Window Rock, AZ, Marvin S. Cohen, Esq., Judith M. Dworkin, Patricia Ferguson Bohnee, Sacks Tierney PA, Scottsdale, AZ, for Plaintiffs.

---

1. The Court did not schedule a hearing on the Motions because the parties submitted memoranda thoroughly discussing the law and evidence in support of their positions and oral argument would not have aided the Court's decision. *See Mahon v. Credit Bur. of Placer*

## BACKGROUND

### I. Redistricting in Arizona

In November 2000, Arizona voters approved Proposition 106, an Arizona ballot measure that amended the Arizona Constitution to establish the Arizona Independent Redistricting Commission (the "IRC" or the "Commission"). (First Am. Compl. ¶ 21 [Doc. # 15].) Proposition 106 required the IRC to reapportion Arizona's legislative and congressional districts for the 2002 through 2010 elections according to specific redistricting criteria.[2] (Id. ¶ 22.)

The IRC held a series of public hearings in the summer of 2001 and in November 2001 adopted a legislative redistricting plan for use in the 2002 legislative elections (the "2001 Legislative Plan"). (Id. ¶ 23.) The IRC submitted its new legislative plan to the Department of Justice ("DOJ") for preclearance on January 24, 2002.[3] (Id. ¶ 24.) A preclearance decision from the DOJ, however, was not immediately forthcoming. (See id.) Once the DOJ received the submission, it had 60 days in which to object to or preclear the plan. (Id.) (citing 28 C.F.R. § 51.9(a) & (b).)

On March 2, 2002, the Arizona Minority Coalition for Fair Redistricting (the "Minority Coalition" or "Coalition") and several individual plaintiffs filed a complaint in Arizona state court alleging that the 2001 Legislative Plan violated the Arizona Constitution. (Id. ¶ 24.) In particular, the Minority Coalition alleged that the IRC failed to comply with its duty to create and maintain "competitive" districts. See Navajo Nation v. Arizona Indep. Redistricting Comm'n, 230 F.Supp.2d 998, 1002 (D.Ariz.2002) (discussing Minority Coalition's state court suit).

On May 1, 2002, because no time remained for a state court decision to affect the 2002 legislative elections and because the DOJ had not yet rendered its preclearance decision concerning the 2001 Legislative Plan, the IRC filed a complaint in this Court seeking to enjoin the use of preexisting 1994 legislative districts and to order the implementation of a redistricting plan on an interim basis for the 2002 legislative elections. (First Am. Compl. ¶ 27.) After extensive hearings and testimony, this Court found that the 1994 districts were severely malapportioned, enjoined their use, and adopted an interim legislative plan for use in the 2002 elections. See Navajo Nation, 230 F.Supp.2d at 1007–1016.

During the summer of 2002, the IRC again met to revise the legislative districts for the 2004 through 2010 elections. (Id. ¶ 35.) The IRC finalized a new legislative plan on August 14, 2002 (the "2002 Legislative Plan" or "2002 Plan") and submitted

County, Inc., 171 F.3d 1197, 1200 (9th Cir. 1999), modified, 171 F.3d 1197.

**2.** The criteria include compliance with the United States Constitution and the Voting Rights Act and—to the extent practicable— equal population between districts, districts that reflect communities of interest, district lines that use visible geographic features and city boundaries, and "competitive districts ... where to do so would create no significant detriment to the other goals." Ariz. Const. art. IV, pt. 2, § 1(14)(A)-(F). For background on Proposition 106, see Rhonda L.

Barnes, Comment, Redistricting in Arizona Under the Proposition 106 Provisions: Retrogression, Representation and Regret, 35 Ariz. St. L.J. 575 (2003).

**3.** Because Arizona has a history of discrimination, it is required to submit redistricting plans for preclearance to the DOJ or the District Court for the District of Columbia under § 5 of the Voting Rights Act. See Arizona v. Reno, 887 F.Supp. 318, 319–20 (D.D.C.1995); 42 U.S.C. § 1973c; see also 28 C.F.R. § 51.10.

it to the DOJ for preclearance. (*Id.*) The DOJ precleared the Plan on February 10, 2003. (*Id.*) The Minority Coalition, however, remained unsatisfied with the new districts. It amended its complaint in state court and alleged that the IRC again failed to create competitive districts. (*Id.* ¶ 36.)

The Arizona Superior Court set a trial date of July 8, 2003. (*Id.* ¶ 38.) On May 30, 2003, however, the Commission removed the case to this Court and the trial was postponed. (*Id.*) This Court remanded the case to state court on September 5, 2003 for lack of federal jurisdiction. *See Arizona Minority Coalition v. Arizona Indep. Redistricting Comm'n*, 284 F.Supp.2d 1240, 1249 (D.Ariz.2003). After remand, the Arizona Superior Court set trial for November 2003. (First Am. Compl. ¶ 40.)

The trial in state court began on November 12, 2003 and continued for six weeks. (*Id.* ¶ 41.) On January 16, 2004, the court issued a written ruling: (1) declaring that the IRC's 2002 Legislative Plan violated the state constitution by failing to create competitive districts, (2) enjoining the use of the 2002 Legislative Plan for the 2004 legislative elections, (3) ordering the IRC to reconvene and establish lawful legislative districts within 45 days, and (4) ordering the IRC to appear on March 5, 2004 with a new legislative map. (*Id.*)

From February through April 2004, the IRC met to create a new legislative district plan that complied with the state court's January 16, 2004 order. (*Id.* ¶ 43.) The Commission adopted many of the district configurations and Hispanic Voting Age percentage requests made by the Minority Coalition and retained a majority Native–American district. (*Id.* ¶ 45.) The IRC presented the new legislative plan to the Arizona Superior Court on March 5, 2004. (*Id.*) Both the Commission's experts

and the Plaintiffs approved of the plan. (*Id.*)

To comply with the Arizona Constitution, the Superior Court ordered that the March 2004 legislative redistricting plan be advertised for at least 30 days to allow the public to comment on the plan. (*Id.* ¶ 47) (citing ARIZ CONST., art IV, pt.2, § 1(16).) The Commission formally placed the plan on its website on March 8, 2004, along with a notice stating that the public had 30 days to comment. (*Id.*)

On April 2, 2004, the IRC amended the March 2004 legislative redistricting plan based on public comments received. (*Id.* ¶ 48.) The IRC finalized the plan on April 12, 2004 (the "April 12 Legislative Plan" or "April 12 Plan"). (*Id.*) On April 15, 2004, the Arizona Superior Court held a hearing in the state court action to take testimony from the IRC in support of the April 12 Plan and to hear objections from other parties. (*Id.* ¶ 49.) The court concluded that the Plan complied with the Arizona and federal constitutions and ordered the IRC to submit it to the DOJ for preclearance and to seek expedited review. (*Id.* ¶ 50.)

The IRC submitted the April 12 Legislative Plan to the DOJ for preclearance on April 20, 2004. (*Id.* ¶ 51.) Although the IRC requested expedited consideration, there was no guarantee that the DOJ would complete its review in time to meet critical election deadlines. The DOJ had 60 days to preclear or object to the April 12 Legislative Plan. *See* 28 C.F.R. §§ 59(a) & (b). If the submission was incomplete or if the DOJ required additional information, the 60–day clock would begin anew once the DOJ received the further information. Plaintiffs pointed out that if this were to occur, the preclearance deadline could extend beyond the August 5, 2004 early balloting date for the primary election. (First.Am.Compl.¶ 72.)

## II. This Litigation

On April 23, 2004, the Minority Coalition and several other Plaintiffs[4] filed a Verified Complaint in this District seeking a preliminary and permanent injunction directing the IRC and the Arizona Secretary of State to conduct the 2004 legislative primary and general elections under the April 12 Legislative Plan or an alternative legislative redistricting plan that complies with the United States Constitution, the Voting Rights Act of 1965 (the "VRA"), and the Arizona Constitution on an emergency interim basis despite the lack of preclearance from the DOJ. (Verified Compl. at 13–14 [Doc. # 1].)

The Coalition alleged that without a legislative plan ordered by this court, the 2004 legislative primary and general elections would "at best be delayed and at worst cancelled." (*Id.* ¶ 58.) Arizona law has technical procedures that had to be completed before the primary and general elections.[5] To qualify for the primary election ballot, partisan legislative candidates had to file their nomination petitions no later than June 9, 2004. A.R.S. §§ 16–311, 16–314. The Arizona Secretary of State had to certify the names of all legislative candidates who have qualified for the ballot by June 10, 2004, including the number of the legislative districts for each candidate. (Verified Compl. ¶ 50.)

All matters pertaining to candidate qualification were required to be resolved before ballots could be printed. A.R.S. §§ 16–314, 16–351. Candidate qualification challenges had to be filed by June 23, 2004, and decided by the trial court by July 2, 2004. A.R.S. § 16–314, 16–351. Appeals from the trial court decisions in election contests had to be filed no later than July 7, 2004, with a decision from the Arizona Supreme Court to be rendered promptly. *Id.* Federal law required that overseas military personnel be sent a list of qualified candidates at least 60 days before the election, which in this case meant a deadline of July 9, 2004 for the 2004 primary election. (Verified Compl. ¶ 51.) Precinct boundaries had to be established in conformity with the legislative districts, A.R.S. § 16–411, and any change in those boundaries also had to be precleared.

This case was originally assigned to the Hon. Mary H. Murguia. At a preliminary pretrial conference before Judge Murguia on Friday, April 30, 2004, the IRC indicated that it would be contesting federal jurisdiction. (*See* Tr. at 9 [Doc. # 18].) DOJ representatives, present at the hearing by telephone, declined to specify when they would finish their review of the April 12 Legislative Plan and also indicated by a letter they had faxed earlier in the day that the Court had no jurisdiction to grant the Plaintiffs' requested relief. (*Id.* at 7–8.) In an attempt to gain a federal jurisdictional foothold, the Minority Coalition responded by filing a First Amended Complaint on Monday, May 3, 2004. [Doc. # 15.] This First Amended Complaint raised equal protection, Voting Rights Act ("VRA"), and Fifteenth Amendment claims against the already-enjoined 1994 legislative districts. (*Id.* ¶¶ 57–60.) It also claimed that the 2002 Plan—enjoined by the Arizona Superior Court in January as

---

4. The other Plaintiffs are Pima County Supervisor Ramon Valdez, State Senator Peter Rios, State Representative Steve Gallardo, Maricopa County Supervisor Mary Rose Garrido Wilcox, Carlos Avelar, James Sedillo, Esther Lumm, Virginia Rivera, Los Abogados, the Navajo Nation, and Leonard Gorman.

5. Arizona's primary election is scheduled to occur on September 7, 2004. *See* A.R.S. § 16–201.

unconstitutional under state law—violated § 2 of the VRA.[6] (*Id.* ¶¶ 61–65.)

On May 5, 2004, the Court granted the IRC's Motion to Transfer this case from Judge Murguia to this Court. [Doc. # 16.] The IRC moved to dismiss on May 6, 2004. [Doc. # 32.] About the same time, the IRC filed a motion in Arizona Superior Court asking the court to stay its injunction against the IRC's 2002 Legislative Plan in light of impending election deadlines, the IRC's appeal of the Superior Court's ruling, and the lack of any other enforceable plan. The IRC emphasized that the 2002 Legislative Plan had already been precleared by the DOJ. The trial court denied the motion—in part on the assumed availability of interim relief in this Court—and the IRC appealed that ruling to the Arizona Court of Appeals. (*See* Not. of Filing) [Docs.## 38 and 49.]

The Court of Appeals scheduled oral argument for May 27, 2004 on the IRC's request for a stay. This Court found it imperative to issue its ruling before that date, and on May 26, 2004 issued a short Order announcing its decision to grant the IRC's Motion to Dismiss and deny the Plaintiffs' Request to Convene a Three–Judge Court, Application for Order to Show Cause, and Application for a Preliminary Injunction. On Friday, May 28, 2004, the Arizona Court of Appeals stayed the Superior Court's injunction against the 2002 Legislative Plan and allowed the Plan's configured districts to be used in the 2004 elections.

## DISCUSSION

### I. Overview

Although Plaintiffs made a few pale attempts to raise federal questions in their Complaint and First Amended Complaint, this action at its core concerned only state constitutional concerns. Plaintiffs waged a long battle in Arizona state court to declare the IRC's 2002 Legislative Plan in violation of the state constitution. They succeeded in that battle, at least temporarily. The trial court found that the 2002 Plan failed to favor the creation of competitive districts and enjoined its use. The IRC then redrew its map and submitted it to the DOJ for preclearance as ordered.

But election deadlines were fast approaching, and the new map had to be precleared by the DOJ before it can be used. Concerned about the possibility that the DOJ might not render a preclearance decision in time, Plaintiffs rushed into federal court arguing emergency. Unless this Court ordered interim use of the new plan, Plaintiffs argued, Arizona would have no legally enforceable legislative map for the upcoming elections. At the same time, the IRC asked the trial court and then the Court of Appeals to stay the trial court's injunction against the 2002 Legislative Plan. That Plan was precleared by the DOJ in February 2003 and no § 5 barriers precluded its use.

As time went on and as the parties focused the issues in their briefs, it became clear to the Court that the only "emergency" was whether Plaintiffs could implement a plan that reflected their interpretation of the state constitution before the Arizona Court of Appeals or Supreme Court had sufficient time to act on the IRC's request for a stay. Arizona already had a federally precleared legislative plan (the 2002 Plan), and nothing barred its use except the Superior Court's state constitu-

---

6. Plaintiffs alleged that the IRC "added more than 5,000 additional voting age Hispanics to Legislative District 14 in the 2002 Legislative Plan, diluting the influence of Hispanic voters in another legislative district in violation of Section 2 of the Voting Rights Act of 1965." (*Id.* ¶ 64.)

tional ruling. That ruling was on appeal in the state courts, and the IRC had in the meantime moved to stay the injunction. Reluctant to enter the thicket of this state constitutional dispute, the Court decided—as it should—to leave the question of which legislative map to use to the state courts.

Even more central to the Court's decision, however, was that this Court has no power to order the emergency interim use of the state court's non-precleared April 12 Plan—even in the face of the potential delay of the legislative elections. To the contrary, United States Supreme Court precedent makes clear that federal courts are barred from intervening in state apportionment matters in the absence of a violation of federal law and are actually obligated to enjoin the use of non-precleared plans in cases like this—i.e., where the federal court has not itself ordered the voting change. Plaintiffs raised no viable or cognizable federal claims here, and the delay of state legislative elections on state law grounds did not constitute grounds for this Court to circumvent the preclearance procedures established by § 5 of the VRA.

## II. The Request to Convene a Three-Judge Court

■ Plaintiffs asked for an order convening a three-judge court pursuant to 28 U.S.C. § 2284. Title 28 § 2284 provides: "A district court of three judges shall be convened when otherwise required by an Act of Congress, or when an action is filed challenging the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body." The first prerequisite has not been met; as for the second, Plaintiffs' constitutional challenges are wholly insubstantial. *See Simkins v. Gressette,* 631 F.2d 287, 295 (4th Cir.1980) (noting that convening a three-judge court is not required to address insubstantial claims).

Plaintiffs argued that 42 U.S.C. § 1973c is an Act of Congress that requires the Court to convene a three-judge panel. First, as discussed more below, exclusive jurisdiction over actions brought under that statute lies in the United States District Court for the District of Columbia, and this Court has no authority to implement a non-precleared plan unless the plan was crafted by this Court in response to a federal violation. Second, § 1973 applies only in two instances: (1) where a plaintiff has brought an action to *enjoin* the use of an non-precleared voting change under § 5 of the Voting Rights Act, and (2) where a state redistricting body (in this case the IRC) brings an action for a declaratory judgment that a voting change complies with § 5. *See* 42 U.S.C. § 1973. The Minority Coalition did not seek to enjoin the April 12 Plan; rather, it sought to enforce it. Further, the IRC did not bring an action to preclear the Plan—it instead opted to submit the state court's April 12 Plan to the DOJ for administrative preclearance. *See* 42 U.S.C. § 1973c.

Thus, the only question for the Court under § 2284 was whether the Plaintiffs raised a substantial *constitutional* challenge to the apportionment of the state's legislative districts. As discussed below, they did not. Plaintiffs' constitutional attack on the 1994 legislative districts failed for lack of an Article III case or controversy—this Court declared those districts unconstitutional long ago and neither the IRC nor the Secretary of State threatened to use them in the 2004 elections. Further, Plaintiffs' asserted Fifteenth Amendment challenge to the 2002 Plan fails to state a cognizable claim—the Supreme Court has never held nor suggested that vote dilution violates the Fifteenth Amendment. Finally, Plaintiffs' challenge the

2002 Plan under § 2 of the VRA is statutory, not constitutional, and does not require a three-judge court.

## III. Legal Standards Governing the Motions Before the Court

A Rule 12(b)(6) motion to dismiss will be granted where the plaintiff fails to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). For the purposes of a Rule 12(b)(6) motion, "[r]eview is limited to the contents of the complaint," *Clegg v. Cult Awareness Network*, 18 F.3d 752, 755 (9th Cir.1994). The Court, however, may take judicial notice of matters of public record outside the pleadings. *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th cir.1986). A complaint should not be dismissed "unless it appears beyond doubt that plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." *Buckey v. County of Los Angeles*, 968 F.2d 791, 794 (9th Cir.1992) (quotation omitted). To the extent, however, that "matters outside the pleadings [and public record] are presented to and not excluded by the court, the motion shall be treated as one for summary judgment." Fed.R.Civ.P. 12(b); *Del Monte Dunes at Monterey, Ltd. v. Monterey*, 920 F.2d 1496 (9th Cir.1990).

A motion to dismiss under Rule 12(b)(1) "addresses the court's subject matter jurisdiction, derived from the case or controversy clause of Article III[.]" *Biagro Western Sales, Inc. v. Helena Chem. Co.*, 160 F.Supp.2d 1136, 1141 (E.D.Cal.2001). Federal courts are courts of limited jurisdiction. *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). It is assumed that a cause lies outside this jurisdiction, and the burden of establishing the contrary rests on the party asserting jurisdiction. *Id.* A motion to dismiss for "lack of subject matter jurisdiction may either attack the allegations of the complaint or may be made as a 'speaking motion' attacking the existence of subject matter jurisdiction in fact." *Thornhill Publ'n Co. v. General Tel. & Elecs. Corp.*, 594 F.2d 730, 733 (9th Cir.1979).

When a motion to dismiss attacks the allegations of the complaint as insufficient to confer subject matter jurisdiction, all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. *Federation of African Amer. Contractors v. City of Oakland*, 96 F.3d 1204, 1207 (9th Cir.1996). When the motion is a factual attack on subject matter jurisdiction, a defendant may "rely on affidavits or any other evidence properly before the Court." *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir.1989). "It then becomes necessary for the party opposing the motion to present affidavits or any other evidence necessary to satisfy its burden of establishing that the court, in fact, possesses subject matter jurisdiction." *Id.* No presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the existence of jurisdiction. *Thornhill*, 594 F.2d at 733.

Finally, to establish entitlement to a preliminary injunction, a plaintiff must prove either (1) a likelihood of success on the merits and the possibility of irreparable injury, or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in its favor. *See Southwest Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 917–918. These two formulations "represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Hunt v. National Broad. Co., Inc.*, 872 F.2d 289, 293 (9th Cir.1989)

(quotes and citation omitted); *Raich v. Ashcroft*, 352 F.3d 1222, 1227 (9th Cir. 2003) (referring to two formulations as representing "a continuum of equitable discretion, whereby 'the greater the relative hardship to the moving party, the less probability of success must be shown'") (quoting *National Ctr. for Immigrants Rights, Inc. v. INS*, 743 F.2d 1365, 1369 (9th Cir.1984)).

## IV. Preclearance and § 5 of the Voting Rights Act

■ Plaintiffs asked the Court to adopt the state court's April 12 Plan on an emergency interim basis without preclearance. This the Court cannot do. Congress enacted the Voting Rights Act (the "VRA") in 1965 "to rid the country of racial discrimination in voting." *South Carolina v. Katzenbach*, 383 U.S. 301, 315, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966). Faced with election practices in various states that effectively denied minorities the right to vote, Congress hoped through the VRA to end what it perceived as "an insidious and pervasive evil ... perpetuated in certain parts of the country through unremitting and ingenious defiance of the Constitution." *Id.* Before the VRA, "Congress had enacted a series of statutes that aimed to eliminate, on a case-by-case basis, the problem of [voting discrimination]." *United States v. State of Louisiana*, 952 F.Supp. 1151, 1157 (W.D.La.1997) (citing *Katzenbach*, 383 U.S. at 313, 86 S.Ct. 803). These efforts largely failed. "Litigation was slow, favorable court decrees were circumvented with new practices that discriminated against racial minorities, and local officials outright defied court orders." *Id.* (citing *Katzenbach*, 383 U.S. at 314, 86 S.Ct. 803).

"Congress's frustrations with recalcitrant state and local officials found its most potent expression in § 5 of the VRA." *State of Louisiana*, 952 F.Supp. at 1157. Section 5 of the Act was "a response to the common practice in some jurisdictions of staying one step ahead of the federal courts by passing new discriminatory voting laws as soon as the old ones had been struck down." *Beer v. United States*, 425 U.S. 130, 140, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976). By "'freezing election procedures in the covered areas unless the changes can be shown to be nondiscriminatory,'" *Beer*, 425 U.S. at 140, 96 S.Ct. 1357 (quoting H.R.Rep. No. 196, 94th Cong., 1st Sess. 58 (1975)), Congress intended to ensure that gains in minority political participation were not eroded through the new discriminatory procedures and techniques. *See Beer*, 425 U.S. at 140–41, 96 S.Ct. 1357; H.R.Rep. No. 196 at 57–58. Under § 5, a covered jurisdiction must prove that any change in voting practices or procedures does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color before it may implement that change.[7] *See* 42 U.S.C. § 1973c; *Katzenbach*, 383 U.S. at 335, 86 S.Ct. 803.

The State of Arizona is a covered jurisdiction under the Voting Rights Act. 42 U.S.C. § 1973b(b). "A covered jurisdiction has two avenues available to seek the federal preclearance required under § 5." *Lopez v. Monterey County*, 525 U.S. 266, 270, 119 S.Ct. 693, 142 L.Ed.2d 728 (1999) ("*Lopez II*"). "The jurisdiction may submit the proposed voting change to the Attorney General." *Id.* "If the Attorney General affirmatively approves the change

---

7. Because § 5 focuses on "freez[ing] election procedures," a plan has an "impermissible effect" under § 5 only if it "would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Beer*, 425 U.S. at 141, 96 S.Ct. 1357.

or fails to object to it within 60 days, the change is deemed precleared and the jurisdiction may put it into effect." *Id.* Otherwise, "either in the first instance or following an objection from the Attorney General, a covered jurisdiction may seek preclearance for a voting change by filing a declaratory judgment action in the United States District Court for the District of Columbia." *Id.* The change is precleared "if the court declares that the proposed 'qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) [proscribing voting restrictions based on membership in a language minority group].'" *Id.* at 270–71, 119 S.Ct. 693 (quoting 42 U.S.C. § 1973c). If a voting change subject to § 5 has not been precleared, § 5 plaintiffs are entitled to an injunction prohibiting implementation of the change. *Clark v. Roemer,* 500 U.S. 646, 652–53, 111 S.Ct. 2096, 114 L.Ed.2d 691 (1991) (citing *Allen v. State Bd. of Elections,* 393 U.S. 544, 572, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969)).

Fearful that the state court's April 12 Plan might not be precleared by the DOJ in time to meet critical election deadlines, Plaintiffs asked this Court to take immediate action and order that Plan into effect on an interim basis without preclearance. They argued that the 2004 legislative elections would be delayed and possibly cancelled unless this Court acted. The potential delay of a state legislative election is a serious issue, but "do[es] not … change the basic nature of the § 5 preclearance process." *Lopez v. Monterey County,* 519 U.S. 9, 23, 117 S.Ct. 340, 136 L.Ed.2d 273 (1996) ("*Lopez I* "). "Congress designed the preclearance procedure 'to forestall the danger that local decisions to modify voting practices will impair minority access to

the electoral process'" *Id.* (quoting *McDaniel v. Sanchez,* 452 U.S. 130, 149, 101 S.Ct. 2224, 68 L.Ed.2d 724 (1981)). It "chose to accomplish this purpose by giving exclusive authority to pass on the discriminatory effect of purpose of an election change to the Attorney General and to the District Court for the District of Columbia." *Id.* "Because a large number of voting changes must necessarily undergo the preclearance process, centralized review enhances the likelihood that recurring problems will be resolved in a consistent and expeditious way." *McDaniel,* 452 U.S. at 151, 101 S.Ct. 2224.

The Supreme Court has on two occasions reversed lower federal courts for doing exactly what Plaintiffs urged this Court to do—allow elections to proceed under non-precleared state-crafted plans. In *Clark v. Roemer,* 500 U.S. at 652–53, 111 S.Ct. 2096, Louisiana failed to submit for preclearance a number of statutory and constitutional voting changes concerning the election of state judges, many of which were adopted in the late 1960s and 1970s. The appellants sought to enjoin Louisiana's 1990 judicial elections because of the lack of preclearance for those changes. The district court nonetheless permitted the elections to go forward in the absence of preclearance, citing the short time between election day and the latest request for an injunction, the fact that qualifying and absentee voting had begun, and the time and expense of the candidates. On appeal, the Supreme Court reversed, holding that the court erred by not enjoining the elections. "A [state-crafted] voting change in a covered jurisdiction," the Court warned, "'will not be effective as law until and unless cleared.'" *Clark,* 500 U.S. at 652, 111 S.Ct. 2096 (quoting *Connor v. Waller,* 421 U.S. 656, 656, 95 S.Ct. 2003, 44 L.Ed.2d 486 (1975)).

The Court reaffirmed this principle five years later in *Lopez I*, 519 U.S. at 20–25, 117 S.Ct. 340. The facts of that case are relatively complicated and for our purposes here do not warrant a lengthy explanation. The short version is that the appellee Monterey County had enacted a series of ordinances between 1972 and 1983 consolidating its judicial districts into a single countywide municipal court. Like the State of Louisiana in *Clark*, it failed to submit those changes for preclearance to either the Attorney General or the District Court for the District of Columbia. After years of legal wrangling and faced with the prospect of having no judicial elections, a three-judge panel in the District Court for the Northern District of California eventually approved the use of the County's consolidation plan and ordered at-large countywide elections. The Supreme Court, comparing the case to *Clark*, held that it was "error for the [d]istrict court to order elections under that system before it had been precleared by either the Attorney General or the United States District Court for the District of Columbia." *Lopez I*, 519 U.S. at 24, 117 S.Ct. 340.

If this Court were to order the interim use of the state court's legislative plan pending preclearance, it would commit exactly the same error committed by the district courts in *Clark* and *Lopez I*. The "congressional choice in favor of specialized review" in the Department of Justice and District Court for the District of Columbia "necessarily constrains the role of the ... district court." *Id.* "What is foreclosed to such district court is what Congress expressly reserved for consideration by the District Court for the District of Columbia or the Attorney General—the determination whether a covered change does or does not have the purpose or effect 'of denying or abridging the right to vote on account of race or color.'" *Perkins v. Matthews*, 400 U.S. 379, 385, 91 S.Ct. 431,

27 L.Ed.2d 476 (1971) (quoting 42 U.S.C. § 1973). When confronted with a non-precleared state-crafted plan, "[t]he ... district court may determine only whether § 5 covers a contested change, whether § 5's approval requirements were satisfied, and if the requirements were not satisfied, what temporary remedy, if any, is appropriate." *Lopez I*, 519 U.S. at 24, 117 S.Ct. 340. Once a jurisdiction has submitted its plan to either the DOJ or the District of Columbia, " § 5 provides no further remedy." *Id.*

Plaintiffs allude to an emergency exception to § 5's preclearance requirement. This exception—to the extent one may even call it that—finds its genesis in the Supreme Court's decision in *Clark*. In *Clark*, the Court left open the question of whether a district court may ever deny a § 5 plaintiff's motion for an injunction and allow a covered jurisdiction to conduct an election under a non-precleared state-crafted plan. The Court suggested that "[a]n extreme circumstance might be present if a seat's unprecleared status is not drawn to the attention of the [covered jurisdiction] until the eve of the election and there are equitable principles that justify allowing the election to proceed." *Clark*, 500 U.S. at 654–55, 111 S.Ct. 2096. The Court found no such exigent circumstances in *Clark*, even though qualifying and absentee voting had begun under the non-precleared plan. *Id.* And it found no emergency in *Lopez I*, though the County and appellants "seem[ed] unable to fashion an election plan" and "enjoining the elections would leave the County without a judicial election system." *Lopez I*, 519 U.S. at 22, 117 S.Ct. 340. The situation here was much less dire—the IRC submitted the state court's plan to the DOJ on April 20 and while some election deadlines were approaching, the election was months away. The fact that the legislative elec-

tion could have been delayed if the DOJ did not expedite does not in light of the facts of *Clark* and *Lopez* justify an end-run around the preclearance requirement.[8]

Perhaps recognizing that their efforts to persuade this Court to implement the state court's April 12 Plan without preclearance were unlikely to succeed, Plaintiffs urged a possible alternative in their preliminary injunction papers. They argued that the Court should draw and implement a new legislative map in the event it found that it could not approve the use of the April 12 Plan. Undoubtedly animating Plaintiffs' proposal was the fact that the Supreme Court has carved an exception to preclearance in certain cases involving federally court-ordered voting changes. "As a general rule, voting changes crafted wholly by a federal district court in the first instance do not require preclearance." *Lopez II*, 525 U.S. at 285–87, 119 S.Ct. at 704–05 (citing *Connor v. Johnson*, 402 U.S. 690, 691, 91 S.Ct. 1760, 29 L.Ed.2d 268 (1971)). This principle stems from separation-of-powers concerns. *Id.* at 705. As Justice Black observed in *Connor*, "Under our constitutional system it would be strange indeed to construe § 5 to require that actions of a federal court be stayed and reviewed by the Attorney General or the United States District Court for the District of Columbia." *Connor*, 402 U.S. at 695, 91 S.Ct. 1760.

But *Connor's* preclearance exception has its limits. Federal courts have the power to redistrict only in the face of threatened violations of federal law. *See Voinovich v. Quilter*, 507 U.S. 146, 156, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993) ("Federal courts are barred from intervening in state apportionment matters in the absence of a violation of federal law . . . ."). It is against this backdrop that *Connor* carved out its preclearance exception. *See McDaniel v. Sanchez*, 452 U.S. 130, 131, 101 S.Ct. 2224, 68 L.Ed.2d 724 (1981) ("[The] preclearance requirement does not apply to plans prepared and adopted by a federal court to remedy a constitutional violation."). As explained in Sections V–VII below, Plaintiffs have not alleged any substantial federal claims; rather, they attempt to convert *Connor's* limited preclearance exception into a broad-ranging emergency power. Plaintiffs cite no authority, however, for the proposition that federal law creates a right to have local elections conducted on the timetables prescribed by state law. The fact that Plaintiffs may suffer harm within the meaning of Fed.R.Civ.P. 65 does not by itself confer federal jurisdiction. *Cf. Skelly Oil v. Phillips Petroleum Co.*, 339 U.S. 667, 671, 70 S.Ct. 876, 94 L.Ed. 1194 (1950) (Declaratory Judgement Act creates federal remedy but is not itself a basis for federal jurisdiction).

---

**8.** The preclearance requirement is more than just a procedural technicality—it serves to protect minority voters from both subtle and overt discrimination. *See Beer*, 425 U.S. at 140, 96 S.Ct. 1357. Even if the Court had concluded that it had jurisdiction to adopt the April 12 Plan, it would not lightly assume that the Plan meets § 5's requirements. Although the Minority Coalition claimed that the Plan protects the interests of Latinos and other minorities, the Mexican American Legal Defense and Education Fund ("MALDEF") weighed *against* the April 12 Plan because

that plan allegedly "reduces the Latino voting age population in every Latino majority legislative district in Arizona." (5/6/04 letter from MALDEF to DOJ, attached as Exh. 2 to Arizonan's for Fair and Legal Redistricting's Joinder in Mot. to Dismiss [Doc. # 35].). It is interesting to note that in *Navajo Nation*, 230 F.Supp.2d. at 1004, the Minority took a diametrically opposite approach to preclearance—it argued that this Court could not give deference to the IRC's 2001 Legislative Plan because that Plan had not yet been precleared by the DOJ.

The only case cited by Plaintiffs that merits separate comment is *Smith v. Clark*, 189 F.Supp.2d 503 (S.D.Miss.2002). After the 2000 census, Mississippi lost a seat in the United States House of Representatives. *Id.* at 505. The Mississippi Legislature attempted to reapportion the state's congressional districts, but was unsuccessful. *Id.* In October 2001, a group of voters filed an action in state court seeking an injunction directing the adoption and implementation of a redistricting plan. *Id.* One month later, another group filed an action in federal court seeking the same relief. *Id.* They alleged that the previous districts were unenforceable and that any state-crafted plan could not be enforced until it had been precleared. *Id.* The district court found it necessary to devise and implement its own plan to ensure that Mississippi had an enforceable redistricting plan in place before the elections. But *Clark*, unlike this case, involved a valid constitutional challenge to malapportioned districts. It also involved a congressional election. Article I, § 4 of the U.S. Constitution allows states to regulate the manner of choosing Senators and Representatives, but subjects the states to federal oversight.[9] The *Clark* plaintiffs thus presented a stronger case for federal court intervention than the Plaintiffs do here.

Even if Plaintiffs' emergency argument had some merit, that argument was weakened and later eviscerated by the fact that the Defendants moved the Arizona Court of Appeals to stay the trial court's injunction against the 2002 Plan. The 2002 Plan had already been precleared by the DOJ. The Superior Court enjoined it on state constitutional grounds in January 2004, but the Defendants appealed the decision and later moved to stay the injunction. The Arizona Court of Appeals determined that the public interest in having a timely election outweighed the state constitutional concerns identified by Plaintiffs and granted stay relief on Friday, May 28, 2004. Even if this Court had decided that it had the power to adopt the Superior Court's April 12 Plan or to craft its own interim plan, deferral to the state court proceedings would have been warranted. Redistricting is "primarily the duty and responsibility of the State through its legislature or other body, rather than a federal court." *Chapman v. Meier*, 420 U.S. 1, 27, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975). "Absent evidence that these state branches will fail timely to perform that duty, a federal court must neither affirmatively obstruct state reapportionment nor permit federal litigation to be used to impede it." *Growe v. Emison*, 507 U.S. 25, 34, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993).

Federal courts have long been reluctant to intrude on state domestic policy. *See, e.g., Pennsylvania v. Williams*, 294 U.S. 176, 185, 55 S.Ct. 380, 79 L.Ed. 841 (1935) ("It is in the public interest that federal courts of equity should exercise their discretionary power with proper regard for the rightful independence of state governments in carrying out their domestic policy."). This litigation— stripped of Plaintiffs' obfuscation and deflection of the issues—centered entirely around state constitutional concerns. Although Plaintiffs alleged emergency, the only true crisis was whether they could implement a legislative redistricting plan that reflected their interpretation of state constitution before the Arizona Court of

---

9. Article I, § 4 provides that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof." U.S. Const. art I, § 4, cl. 1. But the rest of that clause suggests that federal interests may trump state interests: "but the Congress may at any time by law make or alter such regulations, except as to the place of choosing Senators." *Id.*

Appeals could act on the Defendants' request for a stay. This Court is not *de facto* state appellate body—and even if it concluded that it had jurisdiction to act—principles of federalism and comity would have counseled restraint.

## V. The Challenges to the 1994 Legislative Districts

■ At the status hearing before Judge Murguia on Friday, April 30, 2004, the IRC made no secret of the fact that it would be contesting federal jurisdiction. Ostensibly in hopes of finding a basis for federal jurisdiction before the IRC moved to dismiss, Plaintiffs amended their Verified Complaint over the weekend and raised a host of new federal claims. The first group of new claims involved Fourteenth Amendment, Voting Rights Act, and Fifteenth Amendment challenges to Arizona's 1994 legislative districts. Those challenges fail as a basis for federal jurisdiction because this Court declared those districts unconstitutional over two years ago and no Article III case or controversy exists with respect to their use.

The 2000 decennial census indicated that Arizona's population had increased by 64%—up from 3,665,226 in 1990 to 5,130,-632 in 2000; it also showed substantial population shifts within the preexisting 1994 legislative districts. *Navajo Nation,* 230 F.Supp.2d at 1002. The Equal Protection Clause of the Fourteenth Amendment requires states to apportion their legislative districts on an roughly equal population basis. *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Thus, when the State of Arizona failed to redistrict in time for the 2002 legislative elections, the plaintiffs and intervenors in *Navajo Nation* filed suit in federal court seeking an injunction prohibiting the use of the '94 districts on Fourteenth Amendment grounds. This Court declared those

districts unconstitutional in an order dated May 28, 2002 and enjoined the Secretary of State from using them in the 2002 elections.

Article III of the U.S. Constitution places substantial limits on federal jurisdiction. The doctrines of standing and ripeness—derived from Article III—"ensure that an adequate factual and legal context will sharpen and cabin judicial-decision making" and "safeguard democracy by constraining the authority of an unelected judiciary to pass judgment on the acts of legislatures." *Thomas v. Anchorage Equal Rights Comm'n.,* 220 F.3d 1134, 1143 (9th Cir.2000) (O'Scannlain, J., concurring). "Whether the question is viewed as one of standing or ripeness, the Constitution mandates that prior to our exercise of jurisdiction there exist a constitutional case or controversy, that the issues presented are definite and concrete, not hypothetical or abstract." *Id.* at 1139 (quotation omitted). "In assuring that this jurisdictional prerequisite is satisfied, we consider whether the plaintiffs face 'a realistic danger of sustaining a direct injury'" or "whether the alleged injury is too 'imaginary' or 'speculative' to support jurisdiction." *Id.* (quoting *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979)).

Any claims concerning the 1994 legislative districts were too imaginary and speculative to support jurisdiction. Plaintiffs faced no actual or imminent threat of injury with respect to those districts. Neither the IRC nor the Secretary of State threatened to use them in the 2004 elections. And with good reason: those districts have already been declared unconstitutional. If the Defendants had threatened to use the '94 districts, res judicata would have applied in Plaintiffs' favor and an injunction would have been granted.[10] But they

---

10. "Res judicata, or claim preclusion, treats a

judgment, once rendered, as the full measure

did not, and Plaintiffs' challenges to the 1994 districts were no more concrete than a challenge to the 1984 or 1974 districts. "Our role is neither to issue advisory opinions nor to declare rights in hypothetical cases, but to adjudicate live cases and controversies consistent with the powers granted the judiciary in Article III of the Constitution." *Id.* at 1138. No case or controversy exists over the '94 districts.

## VI. The Voting Rights Act Challenge to the 2002 Legislative Plan

■ As part of their efforts to remain in federal court, Plaintiffs also raised a Voting Rights Act claim against the IRC's 2002 Legislative Plan in their First Amended Complaint. They sought a preliminary and permanent injunction prohibiting the Secretary of State from using that Plan in the 2004 elections.[11] (First. Am.Compl.¶ 61.) Using this Court's *Navajo Nation* plan as a benchmark, Plaintiffs alleged that the 2002 Plan adds more than 5,000 voting age Hispanics to Legislative District 14. (*Id.* ¶ 64.) This increase, they asserted, raises the Hispanic voting age population in District 14 from 55.18% to 58.11% and "dilute[s] the *influence* of Hispanic voters in another legislative district [under § 2 of the VRA]."[12] (*Id.* ¶ 4 (emphasis added).)

Section 2(a) of the VRA prohibits any "voting qualification or prerequisite to voting or standard, practice, or procedure . . . [that] results in a denial or abridgement of the right of any citizen to vote on account

of relief to be accorded between the parties on the same claim or cause of action." *Hydranautics v. FilmTec Corp.*, 204 F.3d 880, 888 (9th Cir.2000) (internal quotations omitted). When a federal judgment is at issue, claim preclusion "applies where (1) the same parties, or their privies, were involved in [a] prior [federal] litigation, (2) the prior litigation involved the same claim as the later suit, and (3) the prior litigation was terminated by a final judgment on the merits." *Gospel Missions of Am. v. City of Los Angeles*, 328 F.3d 548, 555 (9th Cir.2003). The parties to this litigation were parties to *Navajo Nation*, Plaintiffs raised a Fourteenth Amendment claim in *Navajo Nation*, and that claim was terminated by a final judgment on the merits. Claim preclusion would thus apply in Plaintiffs' favor if Defendants threatened to use the 1994 districts. It also serves as another reason to deny Plaintiffs' claims: Plaintiffs have already been accorded relief on their Fourteenth Amendment claim and the rest of their challenges to the '94 districts are moot. While the Court recalls that the parties stipulated amongst themselves not to raise res judicata as a means of barring future proceedings challenging the '94 districts, the res judicata effect of the Court's judgment in *Navajo Nation* is a matter for this Court, not the parties. The Court cannot be controlled by an agreement of counsel on a question of law. *Swift & Co. v. Hocking Valley Ry.*, 243 U.S. 281, 289, 37 S.Ct. 287, 61 L.Ed. 722 (1917).

11. At least, they appeared to seek an injunction. It is difficult to identify precisely what Plaintiffs wanted, because their theories and requests for relief changed from minute to minute. The First Amended Complaint appeared to ask the Court to enjoin the 2002 Plan. But in their Response to the IRC's Motion to Dismiss, Plaintiffs asserted: "[We] *do not* ask this Court to strike down any redistricting plan as unlawful. Rather, Plaintiffs' claims are directed at the absence of a redistricting plan . . . We invoke Section 2 in this Court not as a further means of enjoining [the 2002 Plan], but rather for the limited purpose of ensuring that the 2002 Legislative Plan is not implemented by this Court on an emergency interim basis for use in the 2004 elections[.]" (Pls.' Resp. to Def. IRC's Mot. to Dismiss at 8, 13–14 [Doc. # 36] ) (emphasis in original). If Plaintiff indeed invoked the Voting Rights Act as a defense, then this is not a basis for federal jurisdiction. Matters of defense or avoidance do not confer federal jurisdiction. *Franchise Tax Bd. v. Constr. Labors Vacation Trusts*, 463 U.S. 1, 10, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983). The same analysis applies to Plaintiffs' challenges to the '94 districts.

12. Plaintiffs do not identify that other district, nor do they identify what the Hispanic voting age population is in that district.

of race or color [or membership in a language minority group.]" 42 U.S.C. § 1973(a) (incorporating § 1973(b)(f)(2)). "The essence of a § 2 claim is that certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority voters] to elect their preferred representatives." *Thornburg v. Gingles*, 478 U.S. 30, 47, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). Section 2 "is thus violated by vote dilution"—"the practice of reducing the potential effectiveness of a group's voting strength by limiting its opportunity to translate that voting strength into political power." Bruce M. Clark & Robert Timothy Reagan, *Redistricting Litigation: An Overview of Legal, Statistical, and Case Management Issues* 3 (Fed.Jud.Ctr.2002) (citing *Gingles*, 478 U.S. at 46–51, 106 S.Ct. 2752 and *Shaw v. Reno*, 509 U.S. 630, 641, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993)).

In *Gingles*, 478 U.S. at 50–51, 106 S.Ct. 2752, which involved a challenge to multimember districts, the Supreme Court held that § 2 will not ordinarily be violated unless three preconditions are met.[13] "First, the minority group ... must be sufficiently large and geographically compact to constitute a majority in a single-member district." *Id.* at 50, 106 S.Ct. 2752. "Second, the minority group must be ... politically cohesive." *Id.* at 51, 106 S.Ct. 2752. And third, the majority must vote "sufficiently as a bloc to enable it ...

usually to defeat the minority's preferred candidate." *Id.* These three factors are necessary but not sufficient to establish a § 2 violation. *See Johnson v. DeGrandy*, 512 U.S. 997, 1011, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994); *see also Uno v. City of Holyoke*, 72 F.3d 973, 980 (1st Cir.1995) (*Gingles* preconditions do not end case but raise a presumption of a violation). The statute itself requires plaintiffs to prove denial or abridgement of the right to vote "based on the totality of the circumstances."[14] *See* 42 U.S.C. § 1973(b).

The first *Gingles* precondition is of particular importance here. In *Gingles*, "the plaintiffs alleged and attempted to prove that their ability *to elect* the representatives of their choice was impaired by the selection of a multimember electoral structure." *Gingles*, 478 U.S. at 46, 106 S.Ct. 2752 (emphasis in original). The Court found, at least in the context of a challenge to multimember districts, that the minority group must demonstrate that its population is sufficiently large and geographically compact to constitute a majority in a single-member district. *Id.* at 50, 106 S.Ct. 2752. But the Court declined "to consider whether section 2 permits, and if it does, what standards should pertain to, a claim brought by a minority group, that is not sufficiently large and compact to constitute a majority in a single-member district, alleging that the use of a multimember district impairs its ability *to influence* elec-

---

13. Although *Gingles* construed § 2 in the context of a challenge to multimember districts, the Supreme Court has held that its three-part test applies in some form to vote dilution claims directed against single member districts. *See, e.g., Growe*, 507 U.S. at 40–41, 113 S.Ct. 1075 (applying third precondition); *Voinovich*, 507 U.S. at 148, 113 S.Ct. 1149 (1993) (applying second precondition).

14. The *Gingles* Court listed as relevant to the statute's totality-of-circumstances test the factors set forth in the Senate report on the 1982

amendment to § 2. *Gingles*, 478 U.S. at 44–45, 106 S.Ct. 2752. The Senate report includes such factors as the extent of any history of official discrimination in the state or subdivision affecting the right to vote, whether political campaigns have been characterized by overt or subtle racial appeals, and the extent to which members of the minority group have been elected to public office in the jurisdiction. S.Rep. No. 97–417, at 28–29, *reprinted in* 1982 U.S.C.C.A.N. 177, 206–07.

tions." *Id.* at 46, 106 S.Ct. 2752 (emphasis in original). Since *Gingles,* the Court has three times refused to reach the issue of whether a minority group may bring a vote dilution claim when it constitutes less than a majority of voters in a proposed district. *See Johnson,* 512 U.S. at 1008–09, 114 S.Ct. 2647; *Voinovich,* 507 U.S. at 158, 113 S.Ct. 1149; *Growe,* 507 U.S. at 41 n. 5, 113 S.Ct. 1075.

Lower federal courts, however, have had the opportunity to address at least three types of cases where a minority group does not constitute a majority of voters in a proposed district: (i) "coalition" districts, (ii) "crossover" districts, and (iii) "influence-dilution" or "influence" districts. A coalition district is one in which two separate minority groups allege that a district could be formed in which they could join forces to elect a representative. *See De Grandy,* 512 U.S. at 1020, 114 S.Ct. 2647 (describing such districts). "A 'crossover' district is one where members of the minority group are not a majority of the relevant voting population but nonetheless have the ability to elect representatives of their choice with support from a limited but reliable white crossover vote." *Rodriguez v. Pataki,* 308 F.Supp.2d 346, 375–76 (citing *Hall v. Virginia,* 276 F.Supp.2d 528, 533–34 & nn. 7–10 (E.D.Va.2003)). Coalition and crossover districts "are also referred to as 'performance' districts, 'effective' districts, or 'ability to elect' districts." *Id.* "An 'influence district,'" by contrast, "is where minority voters may not be able to elect a candidate of their choice but can play a substantial, although not decisive role in the electoral process." *Id.* (citing *Georgia v. Ashcroft,* 539 U.S. 461, 123 S.Ct. 2498, 2512, 156 L.Ed.2d 428 (2003)).

Some courts have been willing to extend *Gingles'* first precondition to coalition and crossover districts. In *Campos v. Bay-*

*town,* 840 F.2d 1240, 1244 (1988), the Fifth Circuit permitted African–Americans and Hispanics to be combined for the purposes of complying with the first *Gingles* precondition, so long as the groups could show that they were politically cohesive. "There is nothing in the law," the court said, "that prevents the plaintiffs from identifying the protected aggrieved minority to include both Blacks and Hispanics." The Eleventh Circuit expressed the same opinion in *Concerned Citizens v. Hardee County Bd.,* 906 F.2d 524, 526–27 (1990): "Two minority groups ... may be a single section 2 minority if they can establish that they behave in a politically cohesive manner." The Second Circuit has also allowed aggregation. *See Bridgeport Coalition for Fair Representation v. City of Bridgeport,* 26 F.3d 271, 276 (2d Cir.), *vacated and remanded on other grounds,* 512 U.S. 1283, 115 S.Ct. 35, 129 L.Ed.2d 931 (1994) (combining African–Americans and Hispanics for purposes of satisfying first *Gingles* requirement). *But see Nixon v. Kent County,* 76 F.3d 1381, 1390–92 (6th cir.1996) (en banc) (holding that "[t]he language of the [VRA] does not support the conclusion that coalition suits are part of Congress' remedial purpose").

Similarly, in *Metts v. Murphy,* 2003 WL 22434637, at *6 (1st Cir. Oct 28, 2003) ("*Metts I* "), the First Circuit held that "whatever the status of other influence claims, at least crossover claims are cognizable under the VRA." The court cautioned that *Gingles'* first precondition "should not be read without regard to its function: to determine whether 'the ability of minority voters to elect representatives of their choice' is impeded." *Id.* (citing *Gingles,* 478 U.S. at 48, 106 S.Ct. 2752). In the First Circuit's view, "[r]equiring the protected class to show that it is an absolute majority [would] ignore[ ] the reality that the class could elect its preferred

candidate without such numbers" and "contravene[ ] the plain text of § 2, which requires courts to consider the 'totality of the circumstances.' " [15] *Id.; see also,* Pamela S. Karlan, *Maps and Misreadings: The Role of Geographic Compactness in Racial Vote Dilution Litigation,* 24 Harv. C.R.-C.L. L.Rev. 173, 202 (1989) ("To the extent that courts have read *Gingles* to elevate the ability to create a district with a majority-black electorate into a threshold requirement for establishing liability in all vote dilution litigation, they have improperly applied one particular theory of liability to other distinct types of vote dilution."); *Martinez v. Bush,* 234 F.Supp.2d 1275, 1320 n. 56, 1320–23 (S.D.Fla.2002) (doubting that first *Gingles* factor was intended to be a "literal, mathematical requirement"). *But see Valdespino v. Alamo Heights Indep. Sch. Dist.,* 168 F.3d 848, 851–53 (5th Cir.1999) (calling *Gingles* factors "a bright line test"); *Negron v. City of Miami Beach,* 113 F.3d 1563, 1569 (11th Cir.1997) (indicating same).

The vast majority of courts, however, have rejected pure influence-dilution claims: i.e., § 2 claims directed to districts where a minority group is unable to elect a candidate of its choice even with coalition or crossover support.[16] *See, e.g., Cousin v. Sundquist,* 145 F.3d 818, 828 (6th Cir. 1998) (holding that § 2 violations cannot "consist of an impairment of the minority's ability to *influence* the outcome of the election rather than *determine* it"); *McNeil v. Springfield Park Dist.,* 851 F.2d 937, 947 (7th Cir.1988) ("[W]e cannot consider claims that ... districts merely impair plaintiffs' ability to influence elections. Plaintiffs' ability to win elections must also be impaired."); *Rodriguez,* 308 F.Supp.2d at 379 ("Dilution of the ability to influence representatives is not an injury cognizable under section 2(b) of the VRA"); *Hall v. Virginia,* 276 F.Supp.2d 528 (E.D.Va.2003) (same); *Balderas v. Texas,* No. Civ.A. 6:01CV158, 2001 WL 34104836, at *2 (E.D.Tex. Nov.29, 2001) (same), *aff'd,* 536 U.S. 919, 122 S.Ct. 2583, 153 L.Ed.2d 773 (2002); *DeBaca v. County of San Diego* 794 F.Supp. 990, 996–97 (S.D.Cal.1992) (same); *Turner v. Arkansas,* 784 F.Supp. 553 (E.D.Ark.1991) (same); *Hastert v. State Bd. of Elec.,* 777 F.Supp. 634, 652–54 (N.D.Ill.1991) (same). *But see Armour v. Ohio,* 775 F.Supp. 1044, 1052 (N.D.Ohio 1991) (recognizing influence claim); [17] *McNeil v. Legislative Apportionment Com'n of State,* 177 N.J. 364, 828 A.2d 840, 853–54 (2003) (same); *Metts II,* 363 F.3d at 12 (leaving open the question of whether influence claims are cognizable).

---

**15.** *Metts I* was vacated on rehearing *en banc,* but the *en banc* court essentially affirmed its holding, stating: "We are thus unwilling at the complaint stage to foreclose the *possibility* that a section 2 claim can ever be made out where the African–American population of a single member district is reduced in redistricting legislation from 26 to 21 percent" *Metts v. Murphy,* 363 F.3d 8, 12 (1st Cir.2004) ("*Metts II* ") (emphasis in original).

**16.** The Ninth Circuit has never decided whether influence (or even coalition or crossover) claims are cognizable, but it affirmed a district court's refusal to reopen a case decided prior to *Gingles* to consider an ability-to-influence claim: "We are aware of no successful section 2 voting rights claim ever made without a showing that the minority group was capable of a majority vote in a designated single district ... [*Gingles*], which does nothing more than expressly leave open the question, did not change existing legal standards and thus provides no basis for a motion to reopen." *Romero v. City of Pomona,* 883 F.2d 1418, 1424 & n. 7 (9th Cir. 1989), *overruled on other grounds, Townsend v. Holman Consulting Corp.,* 914 F.2d 1136 (9th Cir.1990).

**17.** It should be noted that *Armour's* recognition of influence dilution claims pre-dated the Sixth Circuit's decision in *Cousin v. Sundquist,* 145 F.3d 818 (6th Cir.1998).

The IRC argues that the Plaintiffs have raised a bare influence dilution claim and it urges the Court to follow the weight of authority rejecting such claims. The Plaintiffs—for their part—do not deny that their § 2 claim is based on influence dilution. Rather, they argue that Rule 8 of the Federal Rules of Civil Procedure necessitates only a short and plain statement of the claim for relief and that they have done just that. They further contend that it would be premature to rule on the merits of their claim at this stage because courts applying that Rule 8 flatly reject the notion that plaintiffs must plead every fact and legal theory they must prove at trial. This is true as a general rule. *See Krieger v. Fadely*, 211 F.3d 134, 134 (D.C.Cir.2000) ("Complaints need not plead law or match facts to every element of a legal theory"). But where a plaintiff pleads with specificity, it is sometimes possible to plead too much. *See Romine v. Acxiom Corp.*, 296 F.3d 701, 706 (8th Cir. 2002) ("[W]hile notice pleading does not demand that a complaint expound the facts, a plaintiff who does so is bound by such exposition.") (quotation omitted). Further, "[d]ismissal [on a Rule 12(b)(6) motion] can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir.1988). Plaintiffs have explicitly raised an influence dilution claim, and the Court finds that such claims are not cognizable under the VRA.

The Court agrees with the majority view that § 2 of the VRA does not provide a remedy for influence dilution. Section 2 protects the ability of minority groups "to participate in the political process and *to elect representatives of their choice.*" 42 U.S.C. § 1973(b) (emphasis added). Although the *Gingles* Court expressed no opinion on influence dilution, it also emphasized: "Unless minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that practice." *Gingles*, 478 U.S. at 50 n. 17, 106 S.Ct. 2752 (emphasis in original); *see also Growe*, 507 U.S. at 40, 113 S.Ct. 1075 (the first precondition is "needed to establish that the minority has the potential to elect a representative of its own choice in some single-member district"). "If a minority population is too small to elect candidates of their choice in a reconfigured district even with the assistance of reliable [coalition or] crossover voters, then it is the size of the population and not the voting practice or procedure that is preventing the minority group from electing representatives of their choice." *Rodriguez*, 308 F.Supp.2d at 379.

More importantly, influence claims "ha[ve] no standards and would be judicially unmanageable." *Rodriguez*, 308 F.Supp.2d at 379. " 'Influence' cannot be clearly defined or statistically proved" and admits of no limiting principle. *Id.* As the Seventh Circuit cautioned in *McNeil*, 851 F.2d at 947, "[c]ourts might be flooded by the most marginal section 2 claims if plaintiffs had to show only that an electoral practice or procedure weakened their ability to influence elections". *See also Metts v. Almond*, 217 F.Supp.2d 252, 258 (D.R.I. 2002) (observing that there would be no "ascertainable and objective standard for adjudicating [influence] claims"), *vacated by Metts II*, 363 F.3d at 12; *Hastert*, 777 F.Supp. at 652–54 (refusing to open "Pandora's box" by accepting influence claims); *McGhee v. Granville County*, 860 F.2d 110, 116 (4th Cir.1988) (citing *McNeil* for proposition that first *Gingles* precondition is necessary to prevent the concept of vote dilution from being "an open-ended one subject to no principled means of application"); *Illinois Legislative Redistricting*

*Comm'n v. LaPaille,* 786 F.Supp. 704, 715 (N.D.Ill.), *aff'd,* 506 U.S. 948, 113 S.Ct. 399, 121 L.Ed.2d 325 (1992) ("The requirement that a minority group be large enough to control a district, not just 'influence' it, enables the courts to adjudicate Voting Rights Act claims with a reasonable amount of efficiency and consistency.")

Even if the Court were inclined to recognize Plaintiffs' influence dilution claim, the Supreme Court's summary affirmance of *Parker v. Ohio,* 263 F.Supp.2d 1100 (S.D.Ohio 2003) forecloses that result. In *Parker,* minority plaintiffs who were not able to form a majority in a single-member district alleged that the state's redistricting plan diluted their voting strength because their group was large enough to "influence" the elections in that district. *Id.* at 1105. A three-judge district court rejected the claim, stating: "Because influence claims are not cognizable in our circuit and the plaintiffs have failed to establish the first *Gingles* precondition, we see no need to discuss whether or not plaintiffs satisfy the second and third conditions. The plaintiffs' claim under section 2 of the Voting Rights Act must fail." *Id.* The Supreme Court summarily affirmed *Par-*

*ker* in November 2003. *Parker v. Ohio,* 540 U.S. 1013, 124 S.Ct. 574, 157 L.Ed.2d 426 (2003). A summary affirmance by the Supreme Court "binds lower courts, unless subsequent developments suggest otherwise." *United States v. Blaine County,* 363 F.3d 897, 904 (9th Cir.2004) (citing *Hicks v. Miranda,* 422 U.S. 332, 344–45, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975)). There have been no doctrinal developments of note since *Parker.*[18]

Finally, the defense of laches bars Plaintiffs' § 2 challenge to the IRC's 2002 Plan, whether based on influence dilution or not.[19] Plaintiffs sought to prohibit the IRC and the Secretary of State from using the 2002 Plan in the 2004 elections. Laches .is one of the affirmative defenses allowed under Rule 8 of the Federal Rules of Civil Procedure and applies where, as here, the claims presented may be characterized as equitable rather than legal. *See Agua Caliente Band of Cahuilla Indians v. Hardin,* 223 F.3d 1041, 1050 (9th Cir. 2000). It is "an equitable limitation on a party's right to bring suit [and rests] on the maxim that one who seeks the help of a court of equity must not sleep on his

**18.** To the extent that the First Circuit's opinion in *Metts II,* 363 F.3d at 12, and the New Jersey Supreme Court's opinion in *McNeil,* 177 N.J. 364, 828 A.2d 840, 853–54, endorse pure influence-dilution claims (versus coalition or crossover claims), the Supreme Court's summary affirmance of *Parker* calls those holdings into doubt. Those decisions were issued after the Court affirmed *Parker,* and they did not address that affirmance. "Although ... the Supreme Court is more willing to reconsider its own summary dispositions than it is to revisit its prior opinions, this principle does not release the lower courts from the binding effect of summary affirmances." *Blaine County,* 363 F.3d 897, 904 (9th Cir.2004). As the Supreme Court has said, lower courts " 'had best adhere to the view that if the Court has branded a question as unsubstantial, it remains so except when doctrinal developments indicate

otherwise.' " *Id.* (quoting *Hicks v. Miranda,* 422 U.S. 332, 344, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975)).

**19.** "While Rule 8(c) of the Federal Rules of Civil Procedure provides that laches shall be set forth as an affirmative defense, where the elements of laches are apparent on the face of a complaint, it may be asserted on a motion to dismiss for failure to state a claim upon which relief may be granted." *Russell v. Thomas,* 129 F.Supp. 605, 605–06 (D.C.Cal. 1955); *see also* 2 *Moore's Federal Practice,* § 12.34[4][b] (Matthew Bender ed. 2003) ("Dismissal under Rule 12(b)(6) may also be appropriate when a successful affirmative defense or other bar to relief appears on the face of the complaint, such as the absolute immunity of a defendant, claim preclusion, or the statute of limitations.")

rights." *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 836 (9th Cir.2002) (quotations omitted). Whether laches bars an action is a discretionary determination to be made by the court based on the particular facts presented. *Apache Survival Coalition v. United States*, 21 F.3d 895, 905 (9th Cir.1994); *Coalition for Canyon Preservation v. Bowers*, 632 F.2d 774, 779 (9th Cir.1980). The defense applies to redistricting cases as it does to any other. *See White v. Daniel*, 909 F.2d 99, 102–04 (4th Cir.1990) (precluding untimely § 2 challenge under doctrine of laches).

■ To determine whether a suit is barred by laches, a court must consider two factors: the diligence of the party against whom the defense is asserted and the prejudice to the party asserting the defense. *Apache*, 21 F.3d at 905; *Coalition for Canyon Preservation*, 632 F.2d at 779. "A determination of whether a party exercised unreasonable delay in filing suit consists of two steps." *Jarrow Formulas, Inc.*, 304 F.3d at 838 (citations omitted). "First, [the Court] assess[es] the length of the delay, which is measured from the time the plaintiff knew or should have known about its potential cause of action." *Id.* (citations omitted). "Second, [the Court] decide[s] whether the plaintiff's delay was reasonable." *Id.* (citations omitted). The Court "also consider[s] whether the plaintiff has proffered a legitimate excuse for its delay." *Id.* (citing *Danjaq, LLC v. Sony Corp.*, 263 F.3d 942, 954–55 (9th Cir.2001)).

"Unreasonable delay, however, is not enough: 'In addition, laches requires prejudice.' " *Danjaq*, 263 F.3d at 954 (quoting *Couveau v. American Airlines, Inc.*, 218 F.3d 1078, 1084 (9th Cir.2000)). "The very purpose of laches as an equitable doctrine—and the reason that it differs from a statute of limitations—is that the claim is barred because the plaintiff's delay occasioned the defendant's prejudice." *Id.* (citing *Telink, Inc. v. United States*, 24 F.3d 42, 45 (9th Cir.1994)). The Ninth Circuit has recognized "two chief forms of prejudice in the laches context—evidentiary and expectations-based [prejudice]." *Id.* "Evidentiary prejudice includes such things as lost, stale, or degraded evidence, or witnesses whose memories have faded or who have died." *Id.* (citations omitted). A defendant may demonstrate expectations-based prejudice "by showing that it took actions or suffered consequences that it would not have, had the plaintiff brought suit promptly." *Id.* (citations omitted)

■ The Court finds that Plaintiffs unreasonably delayed raising their § 2 challenge to the IRC's 2002 Legislative Plan. The IRC finalized the 2002 Plan on August 14, 2002. (First Am. Compl. ¶ 35.) That Plan "increased the Hispanic voting age of District 14 to 58.11% from ... 55.18%," and Plaintiffs do not deny that they were aware of the increase. (*Id.* ¶ 37.) Plaintiffs' Superior Court action challenged the 2002 Plan on state law grounds only. (*Id.* ¶ 36); *Arizona Minority Coalition for Fair Redistricting*, 284 F.Supp.2d at 1246. When the IRC removed that case to federal court in June 2003, Plaintiffs disavowed any federal claims. *Id.* And even in their original Complaint in this action, Plaintiffs made no claim under the VRA. Although they had ample opportunity to do so earlier, Plaintiffs did not raise a § 2 challenge to the IRC's 2002 Plan until the IRC indicated that it would be contesting federal jurisdiction. Plaintiffs' § 2 claim is a transparent attempt to gain a federal jurisdictional foothold and secure the use of a plan they prefer, and their two year delay in raising that claim is both inexcus-

able and unreasonable.[20]

The Defendants and the counties and voters of Arizona were prejudiced by the Plaintiffs' delay. The IRC finalized the 2002 Legislative Plan over two years ago before the Plaintiffs filed this suit, and the DOJ precleared the Plan over one year before. Arizona's counties conformed their precincts and readied their election machinery to implement that Plan. And 2004 election deadlines were on the horizon when this Court issued its Order. In *Maryland Citizens for a Representative General Assembly v. Governor of Maryland*, 429 F.2d 606, 610 (1970), the Fourth Circuit found injunctive relief unavailable to plaintiffs who filed a redistricting lawsuit thirteen weeks prior to a filing deadline for candidates for the state legislature. Similarly, in *Simkins v. Gressette*, 631 F.2d 287, 296 (4th Cir.1980), the court found injunctive relief foreclosed to plaintiffs who waited to bring a redistricting suit until two days before the opening of the filing period for candidates for the state legislature. *Maryland Citizens* and *Simkins* are relevant to the applicability of laches because here the courts held that injunctive relief was foreclosed and the availability of injunctive relief depends on the same general equitable principles as laches. *White*, 909 F.2d at 103 n. 6. In this case, as in *Maryland Citizens* and *Simkins*, Plaintiffs waited until just weeks before critical election deadlines to file suit. Laches bars their claim.[21]

■ Even if Plaintiffs' had a viable § 2 challenge to the 2002 Plan, the Court would not have granted preliminary injunctive relief enjoining the use of that Plan for the 2004 legislative elections. The standard for granting a preliminary injunction in redistricting cases does not differ from the general preliminary injunction standard. When the public interest may be affected, that interest must be evaluated and weighed in determining whether to grant injunctive relief. *Southwest Voter Registration Educ. Project*, 344

20. Plaintiffs assert that they had no need to bring a VRA claim because it was "clear that the [2002 Plan] was unconstitutional under the Arizona Constitution" and that their state law claims would preclude the Plan's use. (Pls.' Resp. to IRC's Mot. to Dismiss at 12.) As the Arizona Court of Appeals' stay ruling shows, those claims have not precluded the use of the Plan. Plaintiffs have failed to offer a legitimate reason for not bringing their claim earlier. The Court can only assume that they did not bring it because they were not sincerely concerned for its merits.

21. The IRC also argues that res judicata bars Plaintiffs' § 2 claim because (i) the Plaintiffs challenged the 2002 Plan in state court, (ii) the Plaintiffs did not raise a § 2 claim there, (iii) the state court action was terminated by a final judgment on the merits, and (iv) the parties were the same. (IRC's Mot. to Dismiss at 13.) The Ninth Circuit has held that res judicata bars "any lawsuits on any claims that were raised or *could have been raised in a prior action.*" *Providence Health Plan v. McDowell*, 361 F.3d 1243, 1249 (9th Cir.

2004) (emphasis in original). But federal law does not apply here. The Full Faith and Credit Act, 28 U.S.C. § 1738, requires federal courts to apply state preclusion law to state court judgements. *Migra v. Warren City School Dist. Bd. of Educ.*, 465 U.S. 75, 81, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984). Most jurisdictions follow a transactional test for determining whether prior litigation precludes a new claim. *See Phoenix Newspapers, Inc. v. Dep't of Corrections of State of Arizona*, (1997) (surveying cases). "If the new claim is closely related to the first—because it arises out of the same events—it could and should have been asserted in the first action." *Id.* But Arizona follows a more restrictive test for determining claim preclusion: "If no additional evidence is needed to prevail in the second action than that needed in the first, then the second action is barred." *Id.* at 804. On the face of the pleadings, it is not clear whether additional evidence would have been required to prove a § 2 violation. At least at this stage of the litigation, the IRC did not met its burden of proving res judicata.

F.3d at 917 ("If the recall election ... is enjoined, it is certain that the state of California and its citizens will suffer material hardship by virtue of the enormous resources already invested in reliance on the election proceeding on the announced date"); *Cardona v. Oakland Unified School Dist.*, 785 F.Supp. 837, 839–40 (N.D.Cal.1992) ("[In redistricting cases] public interest sometimes requires that preliminary injunctions against invalid redistricting plans not be issued when, for example, an upcoming election would be delayed.") As the Supreme Court has noted, "Under certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding relief ...." *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). The primary and general elections were quickly approaching, and the public had a significant interest in having those elections proceed without delay. Preliminary injunctive relief would not have been granted.[22]

## VII. The Fifteenth Amendment

■ Almost as a last-minute interjection, Plaintiffs made two off-the-cuff references to the Fifteenth Amendment in their Amended Complaint. The first occurs in the section entitled "Jurisdiction and Venue." (First Am. Compl. ¶ 16 ("This lawsuit arises under the Constitution and laws of the United States, Art. 1, Sec. 2, the Fourteenth Amendment, Sec. 1 and 2, the Fifteen Amendment ....").).) The second occurs in the section challenging the 1994

legislative districts. (*Id.* ¶ 58 ("The 1994 Legislative Districts, if allowed to be used in the 2004 legislative elections, would have the effect of diminishing and abridging the voting strength of Hispanics in violation of ... the Fifteenth Amendment ....").) As discussed in Section V above, no Article III case or controversy exists with respect to the use of the 1994 legislative districts. Further, the bare mention of the Fifteenth Amendment without more in the Amended Complaint's "Jurisdiction and Venue" section does not state a claim. Although Rule 8 of the Federal Rules of Civil Procedure requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," it still requires at least some statement. See Fed.R.Civ.P. 8(a); *Cf. Rizzo v. Goode*, 423 U.S. 362, 371–72, 96 S.Ct. 598, 46 L.Ed.2d 561 (to state a valid claim for a constitutional violation under § 1983, plaintiffs must allege that they suffered specific injury as a result of the specific conduct of a defendant). Plaintiffs have not backed up their purported Fifteenth Amendment claim with any factual allegations, and their claim fails to meet even Rule 8's liberal notice-pleading requirements.

If Plaintiffs intend to base their alleged Fifteenth Amendment claim on the same factual allegations that support their purported § 2 claim—and it appears that way from the arguments they made in their briefs—then their claim still fails. Laches bars the claim for the same reasons it bars Plaintiffs' purported § 2 claim. The IRC adopted the 2002 Legislative Plan in August 2002, and Plaintiffs do not dispute

---

**22.** Moreover, even if the Court found a § 2 violation and decided to grant injunctive relief, the Court would not dispense with the entire 2002 Legislative Plan. The remedy for a § 2 violation in a single-member districting scheme is to redraw district lines to create one or more additional districts in which minority voters are able to exercise electoral

control. *See Bush v. Vera*, 517 U.S. 952, 977, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996); *Shaw v. Hunt*, 517 U.S. 899, 914–15, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996); *De Grandy*, 512 U.S. at 1008, 114 S.Ct. 2647. The Court would therefore modify only those portions of the Plan necessary to remedy the violation.

that they knew that the Plan increased the Hispanic voting age population in Legislative District 14. Yet, Plaintiffs slept on their alleged rights for over two years and did not bring a federal challenge to the Plan until the IRC indicated that it would be contesting jurisdiction in this suit. Arizona had readied its election machinery to implement the 2002 Plan, key election deadlines were approaching, and the legislative election was only months away. The Defendants, the State, and the voters of Arizona would have suffered significant prejudice if the Court proceeded with Plaintiffs' claim and enjoined the Plan.

Even if laches did not apply, Plaintiffs' purported Fifteenth Amendment claim fails to state a claim. The Supreme Court has never held that vote dilution violates the Fifteenth Amendment. *See. e.g., Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 334 n. 3, 120 S.Ct. 866, 145 L.Ed.2d 845 (2000) ("W[e] have never held that vote dilution violates the Fifteenth Amendment ... [and] *we have never even 'suggested' as much*.")(internal citations and quotations omitted) (emphasis added). Nor has it ever found a legislative redistricting plan to run afoul of the Fifteenth Amendment.

*See, e.g., Voinovich,* 507 U.S. at 159, 113 S.Ct. 1149 ("[W]e have never held any legislative apportionment inconsistent with the Fifteenth Amendment."). Indeed, the majority in *Reno* indicated, albeit in *dicta*, that the Fifteenth Amendment "'applies only to practices that directly affect access to the ballot.'" *Reno*, 528 U.S. at 334 n. 3, 120 S.Ct. 866 (quoting *Mobile v. Bolden*, 446 U.S. 55, 65, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980) (Stevens, J., concurring in judgment)). Plaintiffs do not claim that they have been denied such access; rather, they allege that the 2002 Plan does not give them as much *influence* as they would like in a single legislative district. Even if Plaintiffs' Fifteenth Amendment claim were not barred by laches, it is not cognizable.[23]

## CONCLUSION

Because this action at its core concerns state constitutional issues and the federal claims raised have no merit, the Court grants the Arizona Independent Redistricting Commission's Motion to Dismiss and denies the other pending Motions.

Accordingly,

---

23. Plaintiffs cite *Page v. Bartels*, 248 F.3d 175, 193 (3d Cir.2001) in support of their purported Fifteenth Amendment claim. In *Page,* the Third Circuit held that the Supreme Court's silence on the issue of whether vote dilution may constitute a Fifteenth Amendment violation did not render the Plaintiffs' Fifteenth Amendment claim insubstantial. *Id.* at 193 n. 12. In that case, the plaintiffs pleaded and argued that the defendants acted with a discriminatory purpose in seeking to dilute the voting strength of African–American voters. *Id.* at 193. Discriminatory purpose is an essential element of a Fifteenth Amendment claim. *City of Mobile v. Bolden*, 446 U.S. 55, 62, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). The plaintiffs in *Page* "principally alleged that [a] discriminatory and dilutive intent [was] obvious from the fact that, under the newly-adopted plan supported by the Defendants, the percentage of the African–American popu-

lation in two of the three existing majority-African-American legislative districts in Essex County (Districts 27 and 29) would be reduced below fifty per cent, while in the third (District 28), the African–American majority would be preserved by a mere 1.2%." *Page,* 248 F.3d at 193. The court noted: "If Plaintiffs are factually correct, then such purposeful action on the part of Defendants may arguably amount to a violation of either the Fourteenth or the Fifteenth Amendments." *Id.* The facts of this case are dramatically different from *Page.* Plaintiffs complain about a mere 3% increase in the Hispanic voting age population of District 14 and about an alleged reduction in their "influence" in another legislative district as a result. If the Fifteenth Amendment indeed extends to vote dilution, the Court doubts that it extends this far.

912

IT IS ORDERED that Defendant Arizona Independent Redistricting Commission's Motion to Dismiss [Doc. # 32–1] is **GRANTED** and this action is **DISMISSED**.

IT IS FURTHER ORDERED that Plaintiffs' Request to Convene a Three–Judge Court Pursuant to 28 U.S.C. § 2284 [Doc. # 2–1] is **DENIED**.

IT IS FURTHER ORDERED that Plaintiffs' Application for Order to Show Cause [Doc. # 3–1] and Application for a Preliminary Injunction [Doc. # 5–1] are **DENIED**.

IT IS FURTHER ORDERED that the Motions to Intervene filed by Arizonans for Fair and Legal Redistricting, et al. [Doc. # 14–1], City of Lake Havasu [Doc. # 23–1], City of Kingman [Doc. # 24–1], Mohave County [Doc. # 25–1], Bullhead City [Doc. # 26–1], County of Santa Cruz [Doc. # 27–1], and City of Flagstaff [Doc. # 28–1] are **DENIED AS MOOT**.